Howex, J.,
dissenting:
The same reasons which influenced me not to j oin the other members of the court in awarding judgment for $764,210.89 constrain me now, after an increase of the judgment to $825,484.37, to state the reasons why at the outset I was unable, and am yet unable, to concur in the judgment for any amount at all in favor of either the Mille Lac Indians as a band or of the Chippewas of Minnesota as a tribe.
*468 The jurisdictional act creates no liability against the United States, nor is there any admission that the Government is liable for losses of any kind which the plaintiffs might have sustained except such as necessarily arose out of the act of the Government to the injury of the rights of the plaintiffs in opening the Mille Lac Reservation to public settlement under the general land laws of the United States. But the opinion of my brethren of the majority, whilst conceding (on the authority of Stewart v. United States, 206 U. S., 185) that the question of damages alleged to have been suffered by the plaintiffs must be determined by the court upon legal principles, goes a step further when it says that the jurisdictional act “ is a warrant of authority to adjudicate results and not determine the means employed to bring about the same.” And, further, that the jurisdictional act is so comprehensive as to “make evident the intention” of Congress to afford relief to plaintiffs for the damages of which they complain.
The two propositions involve contrary and different rules from those to be followed under the act conferring jurisdiction and can not stand with the terms of the act if we are to omit from consideration the validity of the joint resolution of 1893 of the Congress ratifying and confirming the entries on the old Mille Lac Reservation and the validity of the subsequent joint resolution of 1898 declaring the old Mille Lac Reservation open to entry as public land under the general land laws of the United States. Nor can we read into the act conferring jurisdiction a supposed intent to obtain results by merely assessing damages for the value of the lands, which by reason of public entry on a part of these lands (by virtue of a final understanding) had the effect finally of causing the removal of the remnant of the plaintiff band from their former reservation.
If it is intended to convey the idea that the jurisdictional act is a warrant of authority to adjudicate results and not determine the means employed to bring about the same, and that the court can merely draw a conclusion of fact as to the amount of timber destroyed or taken, then there is nothing to appeal from on the court’s findings of fact thus restricted to values. The right of appeal conferred by the act would have no meaning if liability according to strict legal *469 principles were not provided for on the merits with results in the form of damages to follow only when the court should first find the existence of the necessary liability. The intention of Congress to afford relief can not, therefore, be said to be evident, because the act conferring jurisdiction neither undertook to determine rights in advance nor to create new rights of any kind, but merely to provide for a full trial on the merits.
As in the case of the Sac and Fox Indians, 220 U. S., 489, something must be shown in the present case amounting to a right in law, because a merely moral claim can not be the foundation for a possible recovery.
As a matter of fact, there is no question of the moral right involved that can be considered separately from the legal right. There is no room for the court to speculate upon the matter of moral obligation, inasmuch as by the opinion of the majority it is in any event “ quite doubtful if any advantages (by the judgment) will accrue to the Mille Lac Indians” because of the provisions of the act of January 14, 1889, 25 Stat., 642, by which the Mille Lacs were given an interest in the proceeds of the sale of about 4,000,000 acres of land, accompanied with the further right to have allotments in severalty to other lands given to them for occupancy, and that all Chippewa Indians in Minnesota have such a right to participate in the judgment rendered that the amount accruing to the Mille Lacs (by reason of the opening up of the old reservation occupied by them) would amount practically to nothing.
My objections to the judgment are:
(1) That the intent and scope of the various treaties between the United States and the parties for whom judgment is rendered contemplated and provided for the opening of the Mille Lac Keservation to public settlement by the whites, and that in the exercise of full plenary power over the subject matter Congress has so interpreted its obligations, duties, and rights as to provide, by valid and constitutional acts, full, fair, and adequate compensation to plaintiffs which the court can not disregard but must carry out.
Many cases establish the rule that the plenary authority over the tribal relations of the Indians is a political power *470 not subject to be controlled by the judicial department of the Government. So far has the court of final review gone, it was said in Cherokee Nation v. Hitchcock, 187 U. S., 294, that “ the power existing in Congress to administer upon and guard the tribal property, and the power being political and administrative in its nature, the manner of its exercise is a question within the province of the legislative branch to determine, and not one for the courts.” The principle had great emphasis in the case of Lone Wolf v. Hitchcock, 187 U. S., 565, where upon the authority of Stephens v. Cherokee Nation, 174 U. S., 445, the court said that it “must presume that Congress acted in perfect good faith in dealing with the Indians of which complaint is made, and that the legislative branch of the Government exercised its best judgment in the premises. In any event, as Congress possessed full power in the matter, the judiciary can not question or inquire into the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress, and not to the courts. The legislation in question was constitutional.”
In Choctaw and Chickasaw Nations, 179 U. S., 494, the court said that “ the Court of Claims is without authority to determine the rights of parties upon the ground of mere justice or fairness, much less under the guise of interpretation to depart from the plain import of the words of the treaty. Its duty was to ascertain the intent of the parties according to the established rules for the interpretation of treaties,” concluding with the further statement that if the treaty there under consideration “ did injustice to the Choctaws and Chickasaws the remedy is with the political department of the Government.”
In the last-mentioned case the treaty had, as between the United States and the Choctaws and Chickasaws, provided for cession of a vast domain, which included a payment to the tribes of the inconsiderable sum of $300,000, which sum (according to what these tribes yet say) was never paid to the Choctaws and Chickasaws.
(2) My next objection to the judgment as rendered is that, the treaty by which the Mille Lacs relinquished their right *471 in and to the old reservation did not, provide for an exclusive right in them to the lands, nor did it wholly exclude said lands from sale or disposal by the United States, and further, that as the Mille Lacs have received an ample equivalent by way of consideration for the abandonment of their occupancy of their former reservation, they should not receive another and double consideration for the mere sentiment involved in their desire to remain where they were in barbarism and idleness at Government expense.
Judicial notice will be taken of most everything upon which the findings are predicated, but for convenience and a better understanding of the merits attention is directed to those parts of public documents supposed to be material in determining the issues.
The treaty of September 30, 1854; 10 Stat., 1109, is important in that it partitioned the Chippewa lands in Minnesota between the Chippewas of Lake Superior and the Chippewas of the Mississippi. The scheme of that treaty as it appears was to encourage each family to cultivate the soil and to advance the Indian civilization.
The treaty of February 22, 1855, 10 Stat., 1165, mentioned in the second finding of the court, was made with the Chippewas of the Mississippi, and not with the Gull Lake, Mille Lac, Sandy Lake, Pokamogin Lake, Eed Lake, and Pice Lake Bands of Indians. Nor were the tracts of land reserved as a home for the Mississippi Chippewas designated as reservations until the treaty of 1863 and 1864. They were held in common by the whole tribe of the Chippewas of the Mississippi.
The map prepared by the General Land Office and filed as an exhibit in this case throws much light upon the questions to be considered. In fact, it is almost impossible without it to obtain a clear idea of the numerous cessions made by the various treaties between the United States and the Chippewa Indians.
The third finding of the court, is objected to by the defendants as contradictory to the official reports. The Government contends that the outbreak of the annuity Sioux in Minnesota did not start until August, 1862, and that no massacres or depredations were committed until August 17,1862,, *472 and tbat a union of the Chippewas with the hostile Sioux was defeated by the hereditary enmity of the Chippewas and the promises of certain white men who had influence with them that a treaty would be made redressing their grievances. The history of the matter, if important, is to be found in Heard’s History of the Sioux War and Massacres, pages 52, 339; Sisseton and Wahpeton Indians v. United States, 42 C. Cls., 416; 108 U. S., 561. The finding sets forth that Shaw-vosh-kung went to the relief of Fort Ripley with 800 of his band, where the Commissioner of Indian Affairs happened to be with 35 soldiers.
Defendants urge that this statement incorporated in the findings is not sustained by the contemporaneous reports of the Commissioner of Indian Affairs, who was on the ground at the time. The report of the Secretary of the Interior for 1862, pages 223, 224, 227, 228, 229, 230, 231, discloses a state of affairs apparently establishing two things: First, that the Mille Lac Band was restrained by the presence of a number of United States troops equal to their own number from acts of hostility; and, secondly, that there were no promises made to them that they might remain on the land then occupied by them. Whether any effect can be given to these reports in the appellate court on the judicial notice there taken of what the reports show must be determined there. But the report of the Commissioner of Indian Affairs on the ground acting for the United States at the time of the Chippewa troubles, together with the reports of the Secretary of the Interior, are both important in arriving at the intent of the Government and the Indians in the subsequent treaties of 1863 and 1864.
The treaty of 1863 was superseded by article 14 of the treaty of 1864. The White Earth Reservation was not set apart for the home of the Mississippi Chippewas by th'e treaty of 1864, but was set apart for them by the treaty of March 19,1867, 16 Stat. L., 719. The commission appointed under the act of May 15, 1886, 24 Stat., 44, described the White Earth Reservation as “ set apart for the permanent home of the Mississippi Chippewas by the treaty of March 19, 1867, 16 Stat., 719, as part of the consideration for a large and valuable tract of land ceded to the Government.” *473 (Sen. Ex. Doc. No. 115, 49th Cong., 2d sess., 14.) In the agreements made under the act of January 14, 1889, between the United States and the different bands, including the Mille Lacs, the surplus lands of the White Earth Eeservation not needed for allotment there ceded were described as having been set apart for the Indians by the treaty of March 19, 1867. (H. R. Doc. No. 247, 51st Cong., 1st sess., 45-48.)
Defendants object to that part of Finding VI showing that the Mille Lac Indians believed they were reserving to themselves the Mille Lac Eeservation in the execution of the treaty of 1863 and treaty of 1864, because (1) this treaty was not made with the Mille Lac Indians but with the Mississippi Chippewas, who had a common interest in each of the six reservations ceded by the treaty of 1864, and the right to occupy the old reservation was granted as a favor to one band, and not reserved by the Indians at all; and (2) because the statement is a conclusion of law drawn from certain acts of the Indians in their dealings with the Government and should have no place in a finding of fact; and (3) that the treaty of 1864 must be interpreted according to the recognized rules of construction without reference to what each party to the agreement believed it meant, citing Old Settlers case, 148 U. S., 427; Choctaw and Chickasaw Nation v. United States, 179 U. S., 494. Defendants also objects to the second paragraph of the sixth finding, because of its immateriality as to what the commissioner for the United States thought of the purpose of article 12 of the treaty of 1864 or what the Indians thought of it in reaching an agreement under the act of January 14, 1889. The fifth paragraph of the sixth finding is also objected to by the defendants, because the act of May 27, 1902, and the proceedings thereunder are separate and distinct transactions from the negotiations of 1886. The report of the commissioners appointed under the act approved May 15, 1886, 24 Stat., 44, to negotiate with the Chippewa Indians in Minnesota for modifications of existing treaties and changes of reservation, discloses the purpose of securing an agreement for the removal of that portion of the Mille Lac Band (about 200 in number) then residing on the old White Earth Eeservation. (Sen. Ex. Doc. No. 115, 49th Cong., 2d sess., 21, 27, 32, Serial No. 2449.) This report also *474 discloses that though they refused to enter into an agreement there were not more than 200 of the entire band pretending to occupy the Mille Lac Reservation, and but few of those were actually living there, but were scattered through the country south of the reservation; that with the exception of three or four shanties there was not a house on the reservation; that these remnants of.the band were living summer and winter in birch-bark wigwams; and that the women and children were in a state of barbarism.
The act of July 4, 1884, 23 Stat., 76, 98, as originally drafted appropriated $15,000 for the removal and settlement of the White Oak Point and Mille Lac Bands on the White Earth Reservation. The appropriation was afterwards stricken out by the conference committee, and the act as passed provided “ That the lands acquired from the White Oak Point and Mille Lac Bands of Chippewa Indians on the White Earth Reservation in Minnesota shall not be patented or disposed of in any manner until further legislation by Congress.” (Plouse bills, 48th Cong., vol. 199; Conference Rep., Cong. Rec., vol. 15, pt. 6, pp. 5800, 5801.) The appropriation was evidently stricken out because the Mille Lac Band had already been settled on the White Earth Reservation, and only a few scattered Indians remained on the old reservation.
Pursuant to the act of January 14, 1889, three commissioners appointed by the President took a census of the Chippewa Indians of Minnesota. The total number of Chippewa Indians in Minnesota was found to aggregate 8,304, and the quantity of land in all the Chippewa reservations in that State aggregated 4,747,931 acres, of which the Mississippi Chippewas were interested in 796,672 acres (H. R. Doc. No. 287, 51st Cong., 1st sess., 9,15, 27); and thereafter, on different dates, by different agreements with the different bands, there were ceded and relinquished to the United States the Grand Portage Reservation, the Fond du Lac Reservation, the Boise or Wood Fort Reservation, the Deer Creek Reservation, and the surplus, lands of the White Earth and Red Lake Reservations not required for allotment in severalty to said Indians who had become parties to the agreements. Each separate agreement made with each of the bands of *475 the Chippewas in Minnesota was separately approved, in accordance with the act of January 14, 1889, by President Harrison, including the relinquishment of the right of occupancy of the former Mille Lac Eeservation under article 12 of the treaty of May 7, 1864. The agreement entered into with the Mille Lac Band under the act of January 14, 1889, 25 Stat., 612, discloses the relinquishment of the right of occupancy of the Mille Lac Eeservation. The signatures of 189 adult Mille Lac Indians appear to the agreement, which was approved by the President March 4, 1890. (H. R. Doc. No. 247, 51st Cong., 1st sess., 45-48.)
By the treaty of May 7, 1864, six reservations were ceded to the United States, but prior to that treaty the Chippewas as a tribe owned an undivided communal interest in each of the six reservations. By the treaty the Chippewas of the Mississippi as a tribe ceded to the United States the Gull Lake, Mille Lac, Sandy Lake, Eabbit Lake, Pokagomin Lake, and Eice Lake Eeservations. By article 2 a reservation was set apart by boundaries to the six bands ceding the lands, including the Mille Lacs, and by article 3 these Mississippi Chippewas, including' the Mille Lacs, were given a money consideration. Then followed stipulations for expenditures on the reservation set apart by article 2 in improving the property for cultivation and residence, specifying 70 acres for the Mille Lac Band.
The twelfth article of this treaty of May 7, 1864, 13 Stat., 693, upon which the claim is predicated, provided as follows:
“ It shall not be obligatory upon the Indians parties to this treaty to remove from their present reservation until the United States shall have first complied with' the stipulations of articles four and six of this treaty, when the United States shall furnish them with all necessary transportation and subsistence to their new homes and subsistence for six months thereafter: Provided, That owing to the heretofore good conduct of the Mille Lac Indians they shall not be compelled to remove so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites.”
It is conceded that the Government complied with the stip-, illations of articles 4 and 6 of the treaty; and, though a con *476 temporaneous privilege was granted to the Mille Lacs, it was evidently not the intention of the parties to the treaty, taking into consideration all the circumstances, that the Mille Lac Band should forever remain where they were and yet reap the benefits of those provisions of the treaty which looked to their true interests, civilization, comfort, and ultimate location somewhere else.
The treaty, which included article 12, was a cession by the Mississippi Chippewas of their six reservations to the United States. It is a mistake to assume that by the first part of this article the Government receded (or intended to recede) to the Mille Lac Band the reservation. By the cession the United States either acquired a right to the reservation as a reservation or it did not acquire a right. A party can not be both grantor and grantee of the same premises, in the same right, in the same stipulation. In California & Oregon Land Co. v. Worden, 85 Fed. Rep., 94, it was said that such a thing ivas impossible. The stipulation permitting the small number of Mille Lacs to remain on lands (which for a consideration the band had just relinquished to the United States) was not a recession of such title as the band had before, nor a recession of such character as that the band could lawfully object to the entry of the whites where the land was not necessary for Indian use by the election of the band to remain. The treaty ceding the land to the United States was purposeless if, by the same instrument or by any contemporaneous qualification, the United States did not acquire the right to open the land to such public settlement as would not interfere with the limited use and occupancy of the band. The purpose of the treaty agreement was to open the lands to public settlement, except such land as the band should cultivate as long as it remained.
If defendants did not acquire the right to open all that part of the old reservation (to white settlement) not necessary for the occupancy and subsistence of the band as long as the band remained, then the conditions imposed by the twelfth article must be held to have operated to destroy the manifest intention of the Government at the time to provide homesteads for white settlers and the manifest intention of *477 the Mille Lac Band to adjust themselves to the expectations of the United States in that behalf. The United States could not have intended that the band should remain indefinitely as vagrants and practically in a state of barbarism. From all that occurred the manifest intent stated must control.
The thing the Government did do in taking over the six reservations was to give a money consideration for the cession of these lands to the United States, and then, by way of grace, provide that, because of past good conduct, the Mille Lacs should not be compelled to remove so long as they should not in any way interfere with or molest the persons or property of the whites who might come on the reservation by the permission of the Government.
Why should the Government stipulate in the proviso that if the band remained they should neither interfere with nor molest the persons and property of the whites if the Government, by necessary implication from the language used, had not reserved the right to place whites somewhere on the reservation? Certainly at the time of the treaty there were no whites there, because the reservation up to the promulgation of the agreement was Indian country. Such whites as may have unlawfully come in as trespassers on the reservation before the treaty was made were without the protection of the Government and continued without protection of any kind until opportunity was afforded to each white person unlawfully there to have entry by Government permission.
By the treaty, 16 Stat, 707, under which the case of the California & Oregon Land Co. v. Worden, supra, was decided there was a proviso that “ within the country ceded a tract of land was set apart as a residence for the tribe making cession to be held and regarded as an Indian reservation.” As to the land thus reserved and expressly declared to be a reservation, the right of occupancy originally in those who made the cession of a large tract remained precisely the same after the treaty as before the cession for the small tract reserved for residence purposes. The case at bar is entirely different. Here the privilege of remaining on the premises did not have the effect of perpetuating the right of the Mille Lacs to the 61,000 acres, because of the stipulation necessarily implied that the whites who might be put on such part of *478 the land as was not actually in Indian use should not be interfered with or molested by the band. Any other interpretation would have had the effect of destroying the treaty entirely. Nor did the right to remain confer any such privilege as gave the band the right to the timber taken off by trespassers or by permission of the Government, except such timber as was incidental to the use of the land.
In United States v. Cook, 19 Wall., 591, the Government by treaty with the Menomonees, 7 Stat., 344, paid $20,000 for a cession of land. The Oneidas, to whom a part of the Menomonee cession had been apportioned, ceded to the United States all the lands set apart to them except a small tract to each individual, which they reserved to themselves ■to be held as other Indian lands. A small number of the occupants cut timber from a part of the reservation not occupied in severalty, which they removed and sold to Cook. Beplevin by the United States against Cook was brought to recover possession of the timber which had been converted into saw logs. Following the early case of Johnson v. McIntosh, 8 Wheat., 574, the Supreme Court held that, for the purposes of agriculture, tribes as occupants might clear the lands of the timber to such an extent as might be reasonable. But the improvement of the land to justify any cutting of the timber must be done in good faith, as the improvement was the principal thing and the cutting of the timber the incident only. The court further held that the severance of timber for purposes of improvement only was a legitimate use, but that if timber should be severed for purposes of sale the cutting would be wrongful and the timber when cut would become the absolute property of the United' States.
If the Mille Lac Band in the present case had cut timber for sale upon the faith of their right to remain as occupants such timber would instantly have become the property of the United States, discharged of any Indian rights conferred by the privilege given to remain, because the fee to the land was in the Government. As by the privilege to remain the Mille Lac Band could not acquire any such right in the timber as to justify the court in rendering a judgment in *479 their favor for the waste, how then are we to measure the value of the occupancy ?
By the act of March 3, 1865, 13 Stat., 541, appropriations were made for fulfilling the stipulations of the treaty of May 7, 1864, including appropriations for removal and subsistence. Thereafter appropriations were made annually for the benefit of the tribes, including plaintiffs, pursuant to the same treaty. (14 Stat., 273, 496; 15 Stat., 202; 16 Stat., 19, 339, 549; 17 Stat., 169, 443.)
Subsequently another treaty between the United States and the Chippewas of the Mississippi was proclaimed April 18, 1867, 16 Stat., 719, whereby the Chippewas received large benefits pursuant to the scheme of removal.
On March 31,1884, out of 61,028.14 acres contained in the former Mille Lac Reservation 55,976.42 acres had been entered under the general land laws, of which 7,792.16 acres had been patented.
As further showing the intent of the Mille Lac Band, 25 had removed to White Earth prior to 1872, and by May 10, 1882, nearly 400 had removed to the latter reservation. (H. Doc. 1388, 60th Cong., 1st sess., pp. 8, 12.) Prior to December 1, 1886 (as previously stated), not more than 200 of the Mille Lacs remained to avail themselves of the privilege of remaining, and but few of these lived on their former reservation permanently. (Report of Commissioners, Sen. Ex. Doc., 115, 49th Cong., 2d sess., p. 21.) On August 30, 1902, there were 125 male adults on the old Mille Lac Reservation, and quite a number of these had received allotments on the White Earth Reservation. On January 31, 1911, there were 174 of the Mille Lacs scattered around on the former reservation. (Report of Commissioner Hall.) The endeavor on the part of the Government in the latter part of the year 1886 was not really an effort to remove from the old Mille Lac Reservation any of the band, because, as hereinbefore shown, but 200 of the entire band had not removed to their new homes on the White Earth Reservation. The 200 unprovided for were, according to official reports, scattered through the country south of the reservation, and the efforts of the Government to remove the remnant of the band were principally *480 directed to collecting them together from where they principally were south of their old reservation and giving them allotments on the land provided for them by treaty and by legislation.
The allotments of land came under the provisions of a treaty with the Chippewa Indians proclaimed April 18,1867, and certain acts of Congress relating to such Indians. On February 8, 1887, Congress passed an act “ to provide for the allotment of lands in severally to Indians on the various reservations.” This act was amended February 28, 1891. Then followed amending acts unecessary to be stated. Then came the act of April 28, 1904, entitled “An act to provide allotments to Indians on White Earth Reservation in Minnesota.” This was known as the Steenerson Act.
By an act approved May 27, 1902, 32 Stat., 268, the sum of $40,000 was appropriated to pay the Mille Lac Band for improvements made by them on their former reservation upon an appraisement by the Secretary of the Interior; but there was a provision that anyone of them who had leased or purchased any Government subdivision of land within the old reservation from or through a person having title from the Government should not be required to move. Thus it appears that the individuals of the Mille Lac Band were treated fairly and justly by the Government throughout, because every member of the band had the privilege of staying* there by purchase, as the land was opened up for public settlement. Then they were given equal rights in the lands provided for the other Chippewas. The band also acquired rights in the- timber to be sold from the new reservations which had been provided by the Government for all the Chippewas. The band participated in the annuities allowed by the treaties of 1868 and 1864 for purposes of subsistence, and if its members did not avail themselves of the benefit of schools, blacksmith shops, agricultural implements, and other advantages growing out of the removal to the White Earth Reservation it was their neglect or improvidence, as by removal they could have had these benefits at any time they desired to share in such advantages.
The improvements at the time the appraisement was made were practically of no value, and were assessed at what they *481 Lad been previously, the object being to secure the removal of the Indians to the White Earth Reservation.
The clause in the agreement that nothing contained therein should be construed to deprive said Indians of any benefits to which they might be entitled under existing treaties or agreements not inconsistent with agreement then entered into, or the act of May 27, 1902, is the same provision which has been inserted in every agreement made with Indians, since 1896, and has no special significance in this agreement.
(3) My third objection to the judgment is that it represents the value of the Mille Lac Reservation itself and not the value of the right of occupation given to the small band who claimed the right to remain. The judgment does not inure strictly to the benefit of the Mille Lac Indians, nor is it yet restricted to the benefit of the Chippewas of the Mississippi, who held title to the reservation prior to its cession to the United States in 1864, but does provide for all the Chippewas of Minnesota. Most of the Minnesota Chippewas never at any time had any interest in the Mille Lac Reservation. The Lake Superior, Red Lake, and Pembina Bands certainly had no interest. None of these had any interest in the occupation by the Mille Lac Band, who were of the Mississippi Chippewas.. The treaty of September 30, 1854, supra, discloses that the Chippewas of Lake Superior and the Chippewas of the Mississippi had partitioned their land in Minnesota between themselves, the Lake Superior people acquiring lands east of a defined boundary and the Chippewas of the Mississippi acquiring the lands west of that boundary. The treaty of February 22,1855, supra, discloses that the Chippewas of the Mississippi ceded their lands west of the defined boundary line to the United States, out of which five reservations were set apart for their use, to be held in common— the Gull Lake, Sandy Lake, Rabbit Lake, Pokamogin Lake, and Rice Lake Reservations; and another, also to be held in common, the Mille Lac Reservation, which had been ceded by the Chippewas, prior to the partition of their lands, by the treaty of July 29, 1837, supra.
The beneficiaries in the judgment are principally those Indians who were guilty of the outbreak in 1862. Thus the *482 right of occupation given as a reward for good conduct to a Small band is made by the judgment to have been an occupation for the benefit of the Indians engaged in the massacre of the whites.
The claims of the Chippewa Indians for compensation arising from an alleged difference in area of the reservation as actually set apart for them and that provided to be set apart under treaty with the Chippewas of Lake Superior and the Mississippi was heard by this court by virtue of a special jurisdictional act to determine the difference between the area actually set apart to the Fond du Lac Band and that pi’ovided to be set apart in the treaty there mentioned to that band, 34 C. Cls. R., 431. The question in that case involved the acceptance by that band of the terms of the later act of 1889. The Mille Lac Band was given equal rights in and to the lands and timber provided for the Fond du Lacs and other Chippewas besides the reservation to the Mille Lacs of their right to separate allotments. It would now seem that the act of 1889 settled adversely the rights of all the parties declared by the majority of this court to be entitled to share in- the present judgment. The other Chippewas of Minnesota, including the Fond du Lac Band, certainly have no further claim growing out of the occupancy by the Mille Lac Band of the old reservation.
Undoubtedly the Congress have the power at will to make such payment for Indian claims within the category of rights as may seem meet to the Legislature, as well as the right to pay demands by way of gratuity. But when a claim has been presented to a court having jurisdiction and the right of such claimant has been determined by the entry of judgment the right involved in the matter as a claim strictly speaking is res judicata.
But whether the rights of all or any of the Chippewas have or have not been adjudicated under the treaty of 1889 the later acts negative the contentions of all the parties (including the Mille Lac Band) to any further lands or to any other and further compensation for the value of such lands as are not now in their possession.