# LONE WOLF *v.* HITCHCOCK.

## APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 275.   Argued October 23, 1902.—Decided January 5, 1903.

The provisions in article 12 of the Medicine Lodge treaty of 1867 with the Kiowa and Comanche Indians to the effect that no treaty for the cession of any part of the reservation therein described, which may be held in common, shall be of any force or validity as against the Indians unless executed and signed by at least three fourths of all the adult male Indians occupying the same, cannot be adjudged to materially limit and qualify the controlling authority of Congress in respect to the care and protection of the Indians and to deprive Congress, in a possible emergency, when the necessity might be urgent for a partition and disposal of the tribal lands, of all power to act if the assent of three fourths of all the male Indians could not be obtained.   Congress has always exercised plenary authority over the tribal relations of the Indians and the power has always been deemed a political one not subject to be controlled by the courts.

In view of the legislative power possessed by Congress over treaties with the Indians, and Indian tribal property, even if a subsequent agreement or treaty purporting to be signed by three fourths of all the male Indians was not signed and amendments to such subsequent treaty were not submitted to the Indians, as all these matters were solely within the domain of the legislative authority, the action of Congress is conclusive upon the courts.

As the act of June 6, 1900, as to the disposition of these lands was enacted at a time when the tribal relations between the confederated tribes of the Kiowas, Comanches and Apaches still existed, and that statute and the statutes

supplementary thereto, dealt with the disposition of tribal property and purported to give an adequate consideration for the surplus lands not allotted among the Indians or reserved for their benefit, such legislation was constitutional and this court will presume that Congress acted in perfect good faith and exercised its best judgment in the premises, and as Congress possessed full power in the matter, the judiciary cannot question or inquire into the motives which prompted the enactment of such legislation.

In 1867 a treaty was concluded with the Kiowa and Comanche tribes of Indians, and such other friendly tribes as might be united with them, setting apart a reservation for the use of such Indians. By a separate treaty the Apache tribe of Indians was incorporated with the two former-named, and became entitled to share in the benefits of the reservation. 15 Stat. 581, 589.

The first named treaty is usually called the Medicine Lodge treaty. By the sixth article thereof it was provided that heads of families might select a tract of land within the reservation, not exceeding 320 acres in extent, which should thereafter cease to be held in common, and should be for the exclusive possession of the Indian making the selection, so long as he or his family might continue to cultivate the land. The twelfth article of the treaty was as follows:

"Article 12. No treaty for the cession of any portion or part of the reservation herein described, which may be held in common, shall be of any validity or force as against the said Indians, unless executed and signed by at least three fourths of all the adult male Indians occupying the same, and no cession by the tribe shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him as provided in article III (VI) of this treaty."

The three tribes settled under the treaties upon the described land. On October 6, 1892, 456 male adult members of the confederated tribes signed, with three commissioners representing the United States, an agreement concerning the reservation. The Indian agent, in a certificate appended to the agreement, represented that there were then 562 male adults in the three tribes. Senate Ex. Doc. No. 27, 52d Congress, second session,

page 17. Four hundred and fifty-six male adults therefore constituted more than three fourths of the certified number of total male adults in the three tribes. In form the agreement was a proposed treaty, the terms of which, in substance, provided for a surrender to the United States of the rights of the tribes in the reservation, for allotments out of such lands to the Indians in severalty, the fee simple title to be conveyed to the allottees or their heirs after the expiration of twenty-five years; and the payment or setting apart for the benefit of the tribes of two million dollars as the consideration for the surplus of land over and above the allotments which might be made to the Indians. It was provided that sundry named friends of the Indians (among such persons being the Indian agent and an army officer) "should each be entitled to all the benefits, in land only, conferred under this agreement, the same as if members of said tribes." Eliminating 350,000 acres of mountainous land, the quantity of surplus lands, suitable for farming and grazing purposes was estimated at 2,150,000 acres. Concerning the payment to be made for these surplus lands, the commission, in their report to the President announcing the termination of the negotiations, said (Senate Ex. Doc. No. 17, second session, 52d Congress) :

"In this connection it is proper to add that the commission agreed with the Indians to incorporate the following in their report, which is now done:

"The Indians upon this reservation seem to believe (but whether from an exercise of their own judgment or from the advice of others the commission cannot determine) that their surplus land is worth two and one half million dollars, and Congress may be induced to give them that much for it. Therefore, in compliance with their request, we report that they desire to be heard through an attorney and a delegation to Washington upon that question, the agreement signed, however, to be effective upon ratification, no matter what Congress may do with their appeal for the extra half million dollars."

In transmitting the agreement to the Secretary of the Interior, the Commissioner of Indian Affairs said:

"The price paid, while considerably in excess of that paid

to the Cheyennes and Arapahoes, seems to be fair and reasonable, both to the government and the Indians, the land being doubtless of better quality than that in the Cheyenne and Arapahoe reservation."

Attention was directed to the provision in the agreement in favor of the Indian agent and an army officer, and it was suggested that to permit them to avail thereof would establish a bad precedent.

Soon after the signing of the foregoing agreement it was claimed by the Indians that their assent had been obtained by fraudulent misrepresentations of its terms by the interpreters, and it was asserted that the agreement should not be held binding upon the tribes because three fourths of the adult male members had not assented thereto, as was required by the twelfth article of the Medicine Lodge treaty.

Obviously, in consequence of the policy embodied in section 2079 of the Revised Statutes, departing from the former custom of dealing with Indian affairs by treaty and providing for legislative action on such subjects, various bills were introduced in both Houses of Congress designed to give legal effect to the agreement made by the Indians in 1892. These bills were referred to the proper committees, and before such committees the Indians presented their objections to the propriety of giving effect to the agreement. (H. R. Doc. No. 431, 55th Congress, second session.) In 1898 the Committee on Indian Affairs of the House of Representatives unanimously reported a bill for the execution of the agreement made with the Indians. The report of the committee recited that a favorable conclusion had been reached by the committee "after the fullest hearings from delegations of the Indian tribes and all parties at interest." (H. R. Doc. No. 419, first session, 56th Congress, p. 5.)

The bill thus reported did not exactly conform to the agreement as signed by the Indians. It modified the agreement by changing the time for making the allotments, and it also provided that the proceeds of the surplus lands remaining after allotments to the Indians should be held to await the judicial decision of a claim asserted by the Choctaw and Chickasaw

tribes of Indians to the surplus lands. This claim was based upon a treaty made in 1866, by which the two tribes ceded the reservation in question, it being contended that the lands were impressed with a trust in favor of the ceding tribes, and that whenever the reservation was abandoned, so much of it as was not allotted to the confederated Indians of the Comanche, Kiowa and Apache tribes reverted to the Choctaws and Chickasaws.

The bill just referred to passed the House of Representatives on May 16, 1898. (31st Cong. Rec. p. 4947.) When the bill reached the Senate that body, on January 25, 1899, adopted a resolution calling upon the Secretary of the Interior for information as to whether the signatures attached to the agreement comprised three fourths of the male adults of the tribes. In response the Secretary of the Interior informed the Senate, under date of January 28, 1899, that the records of the department "failed to show a census of these Indians for the year 1892," but that "from a roll used in making a payment to them in January and February, 1893, it appeared that there were 725 males over eighteen years of age, of whom 639 were twenty-one years and over." The Secretary further called attention to the fact that by the agreement of 1892 a right of selection was conferred upon each member of the tribes over eighteen years of age, and observed:

"If 18 years and over be held to be the legal age of those who were authorized to sign the agreement, the number of persons who actually signed was 87 less than three fourths of the adult male membership of the tribes; and if 21 years be held to be the minimum age, then 23 less than three fourths signed the agreement. In either event, less than three fourths of the male adults appear to have so signed."

With this information before it the bill was favorably reported by the Committee on Indian Affairs of the Senate, but did not pass that body.

At the first session of the following Congress (the Fifty-sixth) bills were introduced in both the Senate and House of Representatives substantially like that which has just been noticed. (Senate, 1352; H. R. 905.)

In the meanwhile, about October, 1899, the Indians had, at a general council at which 571 male adults of the tribes purported to be present, protested against the execution of the provisions of the agreement of 1892, and adopted a memorial to Congress, praying that that body should not give effect to the agreement. This memorial was forwarded to the Secretary of the Interior by the Commissioner of Indian Affairs with lengthy comments, pointing out the fact that the Indians claimed that their signatures to the agreement had been procured by fraud and that the legal number of Indians had not signed the agreement, and that the previous bills and bills then pending contemplated modification of the agreement in important particulars without the consent of the Indians. This communication from the Commissioner of Indian Affairs, together with the memorial of the Indians, were transmitted by the Secretary of the Interior to Congress. (Senate Doc. No. 76; H. R. Doc. No. 333; first session, Fifty-sixth Congress.) Attention was called to the fact that although by the agreement of October 6, 1892, one half of each allotment was contemplated to be agricultural land, there was only sufficient agricultural land in the entire reservation to average thirty acres per Indian. After setting out the charges of fraud and complaints respecting the proposed amendments designed to be made to the agreement, as above stated, particular complaint was made of the provision in the agreement of 1892 as to allotments in severalty among the Indians of lands for agricultural purposes. After reciting that the tribal lands were not adapted to such purposes, but were suitable for grazing, the memorial proceeded as follows:

" We submit that the provision for lands to be allotted to us under this treaty are insufficient, because it is evident we cannot, on account of the climate of our section, which renders the maturity of crops uncertain, become a successful farming community; that we, or whoever else occupies these lands, will have to depend upon the cattle industry for revenue and support. And we therefore pray, if we cannot be granted the privilege of keeping our reservation under the treaty made with us in 1868, and known as the Medicine Lodge treaty, that au-

thority be granted for the consideration of a new treaty that will make the allowance of land to be allotted to us sufficient for us to graze upon it enough stock cattle, the increase from which we can market for support of ourselves and families."

With the papers just referred to before it, the House Committee on Indian Affairs, in February, 1900, favorably reported a bill to give effect to the agreement of 1892.

On January 19, 1900, an act was passed by the Senate, entitled "An act to ratify an agreement made with the Indians of the Fort Hall Indian reservation in Idaho, and making an appropriation to carry the same into effect." In February, 1900, the House Committee on Indian Affairs, having before it the memorial of the Indians transmitted by the Secretary of the Interior, and also having for consideration the Senate bill just alluded to, reported that bill back to the House favorably, with certain amendments. (H. R. Doc. No. 419, 56th Congress, first session.) One of such amendments consisted in adding to the bill in question, as section 6, a provision to execute the agreement made with the Kiowa, Comanche and Apache Indians in 1892. Although the bill thus reported embodied the execution of the agreement last referred to, the title of the bill was not changed, and consequently referred only to the execution of the agreement made with the Indians of the Fort Hall reservation in Idaho. The provisions thus embodied in section 6 of the bill in question substantially conformed to those contained in the bill which had previously passed the House, except that the previous enactment on this subject was changed so as to do away with the necessity for making to each Indian one half of his allotment in agricultural land and the other half in grazing land. In addition a clause was inserted in the bill providing for the setting apart of a large amount of grazing land to be used in common by the Indians. The provision in question was as follows:

"That in addition to the allotment of lands to said Indians as provided for in this agreement, the Secretary of the Interior shall set aside for the use in common for said Indian tribes four hundred and eighty thousand acres of grazing lands, to be

selected by the Secretary of the Interior, either in one or more tracts as will best subserve the interest of said Indians."

The provision of the agreement in favor of the Indian agent and army officer was also eliminated.

The bill, moreover, exempted the money consideration for the surplus lands from all claims for Indian depredations, and expressly provided that in the event the claim of the Choctaws and Chickasaws was ultimately sustained, the consideration referred to should be subject to the further action of Congress. In this bill as in previous ones provision was made for allotments to the Indians, the opening of the surplus land for settlement, etc. The bill became a law by concurrence of the Senate in the amendments adopted by the House as just stated.

Thereafter, by acts approved on January 4, 1901, 31 Stat. 727, c. 8; March 3, 1901, 31 Stat. 1078, c. 832, and March 3, 1901, 31 Stat. 1093, c. 846, authority was given to extend the time for making allotments and opening of the surplus land for settlement for a period not exceeding eight months from December 6, 1900 ; appropriations were made for surveys in connection with allotments and setting apart of grazing lands; and authority was conferred to establish counties and county seats, townsites, etc., and proclaim the surplus lands open for settlement by white people.

On June 6, 1901, a bill was filed on the equity side of the Supreme Court of the District of Columbia, wherein Lone Wolf (one of the appellants herein) was named as complainant, suing for himself as well as for all other members of the confederated tribes of the Kiowa, Comanche and Apache Indians, residing in the Territory of Oklahoma. The present appellees (the Secretary of the Interior, the Commissioner of Indian Affairs and the Commissioner of the General Land Office) were made respondents to the bill. Subsequently, by an amendment to the bill, members of the Kiowa, Comanche and Apache tribes were joined with Lone Wolf as parties complainant.

The bill recited the establishing and occupancy of the reservation in Oklahoma by the confederated tribes of Kiowas, Comanches and Apaches, the signing of the agreement of October 6, 1892, and the subsequent proceedings which have been detailed, ·

culminating in the passage of the act of June 6, 1900, and the acts of Congress supplementary to said act. In substance it was further charged in the bill that the agreement had not been signed as required by the Medicine Lodge treaty, that is, by three fourths of the male adult members of the tribe, and that the signatures thereto had been obtained by fraudulent misrepresentations and concealment, similar to those recited in the memorial signed at the 1899 council. In addition to the grievance previously stated in the memorial, the charge was made that the interpreters falsely represented, when the said treaty was being considered by the Indians, that the treaty provided "for the sale of their surplus lands at some time in the future at the price of $2.50 per acre;" whereas, in truth and in fact, "by the terms of said treaty, only $1.00 an acre is allowed for said surplus lands," which sum, it was charged, was an amount far below the real value of said lands. It was also averred that portions of the signed agreement had been changed by Congress without submitting such changes to the Indians for their consideration. Based upon the foregoing allegations, it was alleged that so much of said act of Congress of June 6, 1900, and so much of said acts supplementary thereto and amendatory thereof as provided for the taking effect of said agreement, the allotment of certain lands mentioned therein to members of said Indian tribes, the surveying, laying out, and platting townsites and locating county seats on said lands, and the ceding to the United States and the opening to settlement by white men of two million acres of said lands, were enacted in violation of the property rights of the said Kiowa, Comanche and Apache Indians, and if carried into effect would deprive said Indians of their lands without due process of law, and that said parts of said acts were contrary to the Constitution of the United States, and were void, and conferred no right, power or duty upon the respondents to do or perform any of the acts or things enjoined or required by the acts of Congress in question. Alleging the intention of the respondents to carry into effect the aforesaid claimed unconstitutional and void acts, and asking discovery by answers to interrogatories propounded to the respondents, the allowance of a temporary restraining order, and a final decree

awarding a perpetual injunction was prayed, to restrain the commission by the respondents of the alleged unlawful acts by them threatened to be done.   General relief was also prayed.

On January 6, 1901, a rule to show cause why a temporary injunction should not be granted was issued.   In response to this rule an affidavit of the Secretary of the Interior was filed, in which in substance it was averred that the complainant (Lone Wolf) and his wife and daughter had selected allotments under the act of June 6, 1900, and the same had been approved by the Secretary of the Interior and that all other members of the tribes, excepting twelve, had also accepted and retained allotments in severalty, and that the greater part thereof had been approved before the bringing of this suit.   It was also averred that the 480,000 acres of grazing land provided to be set apart, in the act of June 6, 1900, for the use by the Indians in common, had been so set apart prior to the institution of the suit, " with the approval of a council composed of chiefs and headmen of said Indians."   Thereupon an affidavit verified by Lone Wolf was filed, in which in effect he denied that he had accepted an allotment of lands under the act of June 6, 1900, and the acts supplementary to and amendatory thereof.   Thereafter, on June 17, 1901, leave was given to amend the bill and the same was amended, as heretofore stated, by adding additional parties complainant and by providing a substituted first paragraph of the bill, in which was set forth, among other things, that the three tribes, at a general council held on June 7, 1901, had voted to institute all legal and other proceedings necessary to be taken, to prevent the carrying into effect of the legislation complained of.

The Supreme Court of the District on June 21, 1901, denied the application for a temporary injunction.   The cause was thereafter submitted to the court on a demurrer to the bill as amended.   The demurrer was sustained, and the complainants electing not to plead further, on June 26, 1901, a decree was entered in favor of the respondents.   An appeal was thereupon taken to the Court of Appeals of the District.   While this appeal was pending, the President issued a proclamation, dated July 4, 1901, (32 Stat. Appx. Proclamations, 11,) in which it was

ordered that the surplus lands ceded by the Comanche, Kiowa and Apache and other tribes of Indians should be opened to entry and settlement on August 6, 1901. Among other things, it was recited in the proclamation that all the conditions required by law to be performed prior to the opening of the lands to settlement and entry had been performed. It was also therein recited that, in pursuance of the act of Congress ratifying the agreement, allotments of land in severalty had been regularly made to each member of the Comanche, Kiowa and Apache tribes of Indians; the lands occupied by religious societies or other organizations for religious or educational work among the Indians had been regularly allotted and confirmed to such societies and organizations, respectively; and the Secretary of the Interior, out of the lands ceded by the agreement, had regularly selected and set aside for the use in common for said Comanche, Kiowa and Apache tribes of Indians, four hundred and eighty thousand acres of grazing lands.

The Court of Appeals (without passing on a motion which had been made to dismiss the appeal) affirmed the decree of the court below, and overruled a motion for reargument. 19 App. D. C. 315. An appeal was allowed, and the decree of affirmance is now here for review.

*Mr. William M. Springer* and *Mr. Hampton L. Carson* for appellants.

*Mr. Assistant Attorney General Van Devanter* for appellee.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

By the sixth article of the first of the two treaties referred to in the preceding statement, proclaimed on August 25, 1868, 15 Stat. 581, it was provided that heads of families of the tribes affected by the treaty might select, within the reservation, a tract of land of not exceeding 320 acres in extent, which should thereafter cease to be held in common, and should be for the exclusive possession of the Indian making the selection,

so long as he or his family might continue to cultivate the land. The twelfth article reads as follows:

" Article 12. No treaty for the cession of any portion or part of the reservation herein described, which may be held in common, shall be of any validity or force as against the said Indians, unless executed and signed by at least three fourths of all the adult male Indians occupying the same, and no cession by the tribe shall be understood or construed in such manner as to deprive, without his consent, any individual member of the tribe of his rights to any tract of land selected by him as provided in article III (VI) of this treaty."

The appellants base their right to relief on the proposition that by the effect of the article just quoted the confederated tribes of Kiowas, Comanches and Apaches were vested with an interest in the lands held in common within the reservation, which interest could not be divested by Congress in any other mode than that specified in the said twelfth article, and that as a result of the said stipulation the interest of the Indians in the common lands fell within the protection of the Fifth Amendment to the Constitution of the United States, and such interest—indirectly at least—came under the control of the judicial branch of the government. We are unable to yield our assent to this view.

The contention in effect ignores the status of the contracting Indians and the relation of dependency they bore and continue to bear towards the government of the United States. To uphold the claim would be to adjudge that the indirect operation of the treaty was to materially limit and qualify the controlling authority of Congress in respect to the care and protection of the Indians, and to deprive Congress, in a possible emergency, when the necessity might be urgent for a partition and disposal of the tribal lands, of all power to act, if the assent of the Indians could not be obtained.

Now, it is true that in decisions of this court, the Indian right of occupancy of tribal lands, whether declared in a treaty or otherwise created, has been stated to be sacred, or, as sometimes expressed, as sacred as the fee of the United States in the same lands. *Johnson* v. *McIntosh,* (1823) 8 Wheat. 543, 574;

*Cherokee Nation* v. *Georgia*, (1831) 5 Pet. 1, 48 ; *Worcester* v.
*Georgia*, (1832) 6 Pet. 515, 581 ; *United States* v. *Cook*, (1873)
19 Wall. 591, 592 ; *Leavenworth &c. R. R. Co.* v. *United
States*, (1875) 92 U. S. 733, 755 ; *Beecher* v. *Wetherby*, (1877)
95 U. S. 517, 525. But in none of these cases was there in-
volved a controversy between Indians and the government
respecting the power of Congress to administer the property of
the Indians. The questions considered in the cases referred to,
which either directly or indirectly had relation to the nature
of the property rights of the Indians, concerned the character
and extent of such rights as respected States or individuals. In
one of the cited cases it was clearly pointed out that Congress
possessed a paramount power over the property of the Indians,
by reason of its exercise of guardianship over their interests,
and that such authority might be implied, even though opposed
to the strict letter of a treaty with the Indians. Thus, in
*Beecher* v. *Wetherby*, 95 U. S. 517, discussing the claim that
there had been a prior reservation of land by treaty to the use
of a certain tribe of Indians, the court said (p. 525) :

" But the right which the Indians held was only that of oc-
cupancy. The fee was in the United States, subject to that
right, and could be transferred by them whenever they chose.
The grantee, it is true, would take only the naked fee, and
could not disturb the occupancy of the Indians ; that occupancy
could only be interfered with or determined by the United
States. It is to be presumed that in this matter the United
States would be governed by such considerations of justice as
would control a Christian people in their treatment of an igno-
rant and dependent race. Be that as it may, the propriety or
justice of their action towards the Indians with respect to their
lands is a question of governmental policy, and is not a matter
open to discussion in a controversy between third parties,
neither of whom derives title from the Indians."

Plenary authority over the tribal relations of the Indians
has been exercised by Congress from the beginning, and the
power has always been deemed a political one, not subject to be
controlled by the judicial department of the government. Un-
til the year 1871 the policy was pursued of dealing with the

Indian tribes by means of treaties, and, of course, a moral obligation rested upon Congress to act in good faith in performing the stipulations entered into on its behalf. But, as with treaties made with foreign nations, *Chinese Exclusion Case*, 130 U. S. 581, 600, the legislative power might pass laws in conflict with treaties made with the Indians. *Thomas* v. *Gay*, 169 U. S. 264, 270; *Ward* v. *Race Horse*, 163 U. S. 504, 511; *Spalding* v. *Chandler*, 160 U. S. 394, 405; *Missouri, Kansas & Texas Ry. Co.* v. *Roberts*, 152 U. S. 114, 117; *The Cherokee Tobacco*, 11 Wall. 616.

The power exists to abrogate the provisions of an Indian treaty, though presumably such power will be exercised only when circumstances arise which will not only justify the government in disregarding the stipulations of the treaty, but may demand, in the interest of the country and the Indians themselves, that it should do so. When, therefore, treaties were entered into between the United States and a tribe of Indians it was never doubted that the *power* to abrogate existed in Congress, and that in a contingency such power might be availed of from considerations of governmental policy, particularly if consistent with perfect good faith towards the Indians. In *United States* v. *Kagama*, (1885) 118 U. S. 375, speaking of the Indians, the court said (p. 382):

" After an experience of a hundred years of the treaty-making system of government, Congress has determined upon a new departure—to govern them by acts of Congress. This is seen in the act of March 3, 1871, embodied in § 2079 of the Revised Statutes: ' No Indian nation or tribe, within the territory of the United States shall be acknowledged or recognized as an independent nation, tribe, or power, with whom the United States may contract by treaty ; but no obligation of any treaty lawfully made and ratified with any such Indian nation or tribe prior to March third, eighteen hundred and seventy-one, shall be hereby invalidated or impaired.' "

In upholding the validity of an act of Congress which conferred jurisdiction upon the courts of the United States for certain crimes committed on an Indian reservation within a State, the court said (p. 383):

" It seems to us that this is within the competency of Congress. These Indian tribes *are* the wards of the nation. They are communities *dependent* on the United States. Dependent largely for their daily food. Dependent for their political. rights. They owe no allegiance to the States, and receive from them no protection. Because of the local ill feeling, the people of the States where they are found are often their deadliest enemies. From their very weakness and helplessness, so largely due to the course of dealing of the Federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the Executive and by Congress, and by this court, whenever the question has arisen.

      *     *     *     *     *     *     *     *

" The power of the general government over these remnants of a race once powerful, now weak and diminished in numbers, is necessary to their protection, as well as to the safety of those among whom they dwell. It must exist in that government, because it never has existed anywhere else, because the theatre of its exercise is within the geographical limits of the United States, because it has never been denied, and because it alone can enforce its laws on all the tribes."

That Indians who had not been fully emancipated from the control and protection of the United States are subject, at least so far as the tribal lands were concerned, to be controlled by direct legislation of Congress, is also declared in *Choctaw Nation* v. *United States,* 119 U. S. 1, 27, and *Stephens* v. *Cherokee Nation,* 174 U. S. 445, 483.

In view of the legislative power possessed by Congress over treaties with the Indians and Indian tribal property, we may not specially consider the contentions pressed upon our notice that the signing by the Indians of the agreement of October 6, 1892, was obtained by fraudulent misrepresentations and concealment, that the requisite three fourths of adult male Indians had not signed, as required by the twelfth article of the treaty of 1867, and that the treaty as signed had been amended by Congress without submitting such amendments to the action

of the Indians, since all these matters, in any event, were solely within the domain of the legislative authority and its action is conclusive upon the courts.

The act of June 6, 1900, which is complained of in the bill, was enacted at a time when the tribal relations between the confederated tribes of Kiowas, Comanches and Apaches still existed, and that statute and the statutes supplementary thereto dealt with the disposition of tribal property and purported to give an adequate consideration for the surplus lands not allotted among the Indians or reserved for their benefit. Indeed, the controversy which this case presents is concluded by the decision in *Cherokee Nation* v. *Hitchcock*, 187 U. S. 294, decided at this term, where it was held that full administrative power was possessed by Congress over Indian tribal property. In effect, the action of Congress now complained of was but an exercise of such power, a mere change in the form of investment of Indian tribal property, the property of those who, as we have held, were in substantial effect the wards of the government. We must presume that Congress acted in perfect good faith in the dealings with the Indians of which complaint is made, and that the legislative branch of the government exercised its best judgment in the premises. In any event, as Congress possessed full power in the matter; the judiciary cannot question or inquire into the motives which prompted the enactment of this legislation. If injury was occasioned, which we do not wish to be understood as implying, by the use made by Congress of its power, relief must be sought by an appeal to that body for redress and not to the courts. The legislation in question was constitutional, and the demurrer to the bill was therefore rightly sustained.

The motion to dismiss does not challenge jurisdiction over the subject matter. Without expressly referring to the propositions of fact upon which it proceeds, suffice it to say that we think it need not be further adverted to, since, for the reasons previously given and the nature of the controversy, we think the decree below should be

*Affirmed.*

Mr. Justice Harlan concurs in the result.