STATE ex rel. RAYMOND HOLLOW HORN BEAR,
Appellant v. JAMESON, Respondent

(95 N.W.2d 181)

(File No. 9685. Opinion filed March 3, 1959)

**Harold Benedict,** Colman, for Plaintiff and Appellant.

**Phil W. Saunders,** Atty. Gen., **George W. Wuest,** Asst. Atty. Gen., for Defendant and Respondent.

SMITH, J. In this habeas corpus proceeding the applicant for the writ, an enrolled tribal member of the Pine Ridge Indian Reservation, questions the jurisdiction of the Circuit Court of Bennett County, South Dakota, which in 1955 convicted him of the crime of forgery in the third degree. He asserts that the state court was without jurisdiction because the offense was committed within "Indian country" as defined by 18 U.S.C.A. § 1151. The court be-

low held the locus of the offense was not within Indian country and entered its order remanding the applicant to the custody of the warden of the penitentiary of South Dakota. The applicant has appealed.

By 18 U.S.C.A. § 1152 the general laws of the United States as to the punishment of crimes are extended to "Indian country" and that term is defined by § 1151 of that Title. So far as pertinent to the contention of the applicant, that definition reads as follows: "* * * the term 'Indian country', as used in this chapter, means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) * * * (c) all Indian allotments the Indian titles to which have not been extinguished, including rights-of-way running through the same."

The briefs of counsel lead us to believe there was a conflict in the evidence as to the exact locus of the offense. The brief of the applicant asserts the crime was committed on the right-of-way adjacent to what is known as the "Coop Station" at the intersection of U. S. 18 and U. S. 73 at the south limits of the city of Martin, South Dakota. The warden insists the offense was committed at the Coop Station on deeded land. As required by SDC 37.5504 the trial court proceeded in a summary way to settle the facts by hearing the evidence, and incorporated in its order findings which support the position of the warden. A transcript of the testimony is not included in the settled record. Therefore we are unable to pass on the sufficiency of the evidence to support the findings of the court. Hence our review must proceed in the light of the court's findings. Because the record does include a patent dated in November of 1923 describing the property upon which the Coop Station is located, we assume that it is the patent to which the findings make reference. It is dated in 1923 and contains these words: "Whereas, an Order of the Secretary of the Interior has been deposited in the General Land Office, directing that a fee simple patent issue to the claimant Daniel W. Coffey, assignee of Thomas A. Coffey, Senior,

purchaser of land included in the allotment of Black Track, * * *."

The central contention of the applicant is that because the crime was committed within the boundaries of the Pine Ridge Reservation, it was committed within Indian country. He concludes, therefore, that jurisdiction was in the tribal court of that reservation.

█ In making this contention, we do not understand the applicant to question the settled doctrine that the state has jurisdiction to prosecute Indians for such a crime as is here involved when committed outside Indian country. That power stems from the admission of our state to the Union upon an equal footing with the original states. Cf. Sec. 8, Ch. 180, Act of February 22, 1889, 25 Stat. page 676 at 679. Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419; Ward v. Race Horse, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244; 42 C.J.S. Indians § 79 (2), p. 798; and 27 Am. Jur., Indians, § 52, p. 575. It was in recognition of this power of the state that we upheld the jurisdiction of our courts to prosecute one of the ten major crimes committed by an Indian at a place held to be outside of a reservation in Ex parte Moore, 28 S.D. 339, 133 N.W. 817; State v. Sauter, 48 S.D. 409, 205 N.W. 25; and Application of DeMarrias, 77 S.D. 294, 91 N.W.2d 480.

The Coop Station in Martin, South Dakota, is located within the original exterior boundaries of the Pine Ridge Indian Reservation as marked out by the Act of April 30, 1888, Ch. 206, 25 Stat. 94. In the exercise of its plenary power over the Indian tribes (Lone Wolf v. Hitchcock, 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299; Choate v. Trapp, 224 U.S. 665, 32 S.Ct. 565, 56 L.Ed. 941; and Sioux Tribe of Indians v. United States, Ct.Cl., 146 F.Supp. 229) the Congress on May 2, 1910, enacted Ch. 257 of 36 Stat. 440, the pertinent language whereof reads as follows: "That the Secretary of the Interior be, and he is hereby, authorized and directed, as hereinafter provided, to sell and dispose of all that portion of the Pine Ridge Indian Reservation, in the State of South Dakota, lying and being in Bennett County * * * (legal description) * * * **except such portions thereof as have been or may be hereafter alloted to Indians or otherwise**

**reserved,** and except lands classified as timber lands; Provided, That any Indians to whom allotments have been made on the tract to be ceded may, in case they elect to do so before said lands are offered for sale, relinquish same and select allotments in lieu thereof on the **diminished reservation:** * * *." (Emphasis supplied.)

The exterior boundaries of the portion of the reservation described in the foregoing enactment embraced that property on which the above mentioned Coop Station, the locus of the offense, is located.

The intention of Congress as revealed by the Act of May 27, 1910, supra, is determinative of the contention of the applicant that his offense was committed within the reservation and in Indian country. Solution of our problem must be reached in the light of two authoritative decisions.

In United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 398, 58 L.Ed. 676, in considering the contention of an Indian defendant that the federal district court was without jurisdiction because of the locus of his offense was not within Indian country, the court was required to consider a similar congressional act. Cf. Act of July 1, 1892, Ch. 140, 27 Stat. 62. The Act restored a portion of the Colville Reservation in Washington to the public domain, but such restoration was expressly made "subject to the reservations and allotment of lands in severalty to the individual members of the Indians of the Colville Reservation," and the crime was committed on the allotment of one Agnes located within the exterior boundaries of the portion of the reservation opened to settlement. At the time of the offense the alloment was held in trust by the United States for the benefit of Agnes. In holding the allotment to constitute Indian country the court first wrote, "The evident purpose of Congress was to carve out of the portion of the reservation restored to the public domain the lands to be allotted and reserved, as stated, and to make the restoration effective only as to the residue." and further on this statement appears: "In the present case, the original reservation was Indian country simply because it had been validly set apart for the use of the Indians as such, under the superintendence of the government. * * * The same con-

siderations, in substance, apply to the allotted lands which, when the reservation was diminished, were excepted from the portion restored to the public domain. The allottees were permitted to enjoy a more secure tenure, and provision was made for their ultimate ownership without restrictions. But, meanwhile, the lands remained Indian lands, set apart for Indians under governmental care; and we are unable to find ground for the conclusion that they became other than Indian country through the distribution into separate holdings, the government retaining control."

In the recent case of Putnam v. United States, 8 Cir., 248 F.2d 292, 294, wherein the government sought a decree cancelling deeds and leases on land held in trust for allottees and their heirs, which allotments were located within exterior boundaries of the area of the Pine Ridge Indian Reservation opened for settlement described in the Act of May 27, 1910, the question under consideration was whether within section 468 of 25 U.S.C.A. allotted lands within the described area were "outside of the geographic boundaries of any Indian reservation now existing". In announcing a negative answer to that question the court said, "We agree with the District Court that, in determining whether the lands in suit are still held in trust by the United States and are still restricted as to alienation, they are not to be regarded as being 'upon the public domain outside of the geographic boundaries' of the Pine Ridge Indian Reservation. These allotted lands must be deemed to be among those which were not restored to the 'public domain,' having been specifically excepted in the Act of May 27, 1910, from the portion of the Reservation which was open to settlement. Therefore, the lands, in our opinion, continued to be and are now held in trust by the United States for the sole use and benefit of the heirs of the allottees, and are still under the control of Congress for all governmental purposes relating to the guardianship and protection of the Indians. United States v. Pelican, 232 U.S. 442, 447, 34 S.Ct. 396, 58 L.Ed. 676."

It will be observed that these decisions are authority for the proposition that such an allotment as constituted the locus of the offense of the applicant at bar remained

Indian lands and a part of the reservation, and hence within Indian country, while the government held it in trust for the benefit of the allottee and his heirs. It was because "* * * meanwhile the lands remained **Indian lands set apart for Indians under governmental care**" that the court in the Pelican case was unable to find ground for the conclusion that they became other than "Indian country" through the distribution into separate holdings. Whether the Congress intended allotted lands, such as we are considering, to remain Indian country after the Indian title had been extinguished by patent in fee to a purchaser is the question we must decide.

A view of the Act of May 27, 1910, in broad outline is revealing. Subject to exceptions, the act directs the Secretary of the Interior to sell and dispose of the lands within the described portion of Pine Ridge Indian Reservation at appraised prices under the general homestead and townsite laws. It provides that the net proceeds of these sales shall be deposited at interest in the Treasury and used for the benefit of the Indians of the reservation. Lands allotted or presently to be allotted under its provisions are excepted, and timber lands are reserved for the use of the reservation Indians. It provides that the government in so disposing of these surplus lands shall act as a trustee for the Pine Ridge Indians.

That the act was motivated by a congressional purpose to reduce the area of Pine Ridge is manifest. In effect it separated the reservation into two parts. That which the act denominates as the "diminished" reservation, and which we elect to refer to as the "closed" portion of the reservation, was to remain unchanged and to continue to serve the purposes of the government in protecting and dealing with the whole Indian population of the reservation as in the past. The remainder of the reservation, which we will refer to as the "open" portion of the reservation, was to undergo change through a process of settlement into homesteads and townsites. It was contemplated that most of this surplus area would ultimately be settled, patented in fee, and cease to be a part of the reservation and within Indian country. There is no indication that

allotted lands in this open area were reserved and excepted to serve the interests of the Pine Ridge Indians as a whole. It seems apparent that the principal reason for reserving these scattered outlying tracts was to permit the government to respond completely to its obligations to the respective allottees of these tracts. It is equally apparent that as the Indian title to each of these tracts was extinguished they would cease to serve in furthering any phase of the functions of the government in ministering unto its Indian wards. Thereafter such a tract would bear no different relation to those functions than would an adjoining tract of the open area, the Indian title to which had been extinguished by a homestead patent to a settler. Because the Congress obviously did not contemplate the use of these outlying allotted tracts for any purpose in connection with the superintendence and protection of its Indian wards after the Indian title thereto had been extinguished, we are persuaded that after such an extinguishment it intended they should cease to be both a part of the reservation and of the Indian country.

The conclusion we have just expressed gains support from 18 U.S.C.A. § 1151, supra. It will be observed that according to subsection (a) that "Indian country" comprehends " all land within the limits of any Indian reservation under the jurisdiction of the United States government, **notwithstanding** the issuance of **any** patent", but according to subsection (c) the term only comprehends such Indian allotments as "the Indian titles to which have not been extinguished." If subsection (a) is to receive a literal interpretation a patent to alloted lands within the limits of such a reservation which operated to extinguish the Indian title would not remove such a tract from Indian country, but under subsection (c) such a patent would so operate. Hence, it seems logical to believe that the Congress intended subsection (a) to apply to the closed area of reservations, and (c) to apply to allotted lands in open territory. That subsection (c) was intended to apply to allotments of Indian lands in just such an open area as is marked out by the Act of May 27, 1910, is indicated by the reviser's notes to § 1151, supra. It is there stated that "Indian allotments

were included in the definition on authority of the case of United States v. Pelican * * *." Pelican deals with an outlying allotment in such an open area. It was by subsection (c) that such Indian allotments were included in the definition of Indian country. However, only a single class of such allotted lands are described by subsection (c) viz. those to which "the Indian titles to which have not been extinguished". Thus under the familiar rule of express mention and implied exclusion, 82 C.J.S. Statutes § 333, p. 666, the statute failing to indicate a different intention, the inference fairly arises that other classes of allotments, viz. those to which "the Indian titles have been extinguished", are excluded from the definition of Indian country.

All of those considerations have induced the conclusion and holding that the Indian title to the allotted lands on which the Coop Station is located having been extinguished, it was not within Indian country at the time of the commission of the offense in 1955, and hence the state court acted within its powers in passing sentence on the applicant.

Therefore, the order of the trial court is affirmed.

All the Judges concur.