The STATE of Wyoming, Plaintiff,

v.

John Pius MOSS, Defendant.

No. 3813.

Supreme Court of Wyoming.

June 22, 1970.

James E. Barrett, Atty. Gen., Fred C. Reed, Asst. Atty. Gen., Cheyenne, for plaintiff.

Daniel P. Svilar, Lander, for defendant.

Richard V. Thomas, U. S. Atty., Tosh Suyematsu, Asst. U. S. Atty., Cheyenne, for the United States, amicus curiae.

Marvin J. Sonosky, Washington, D. C., for Shoshone Indian Tribe, amicus curiae.

Glen A. Wilkinson, Washington, D. C., for Arapahoe Indian Tribe, amicus curiae.

Teno Roncalio, Roncalio, Graves & Smyth, Cheyenne, (local counsel), amicus curiae.

Before GRAY, C. J., and McINTYRE, PARKER, and McEWAN, JJ.

Mr. Justice PARKER delivered the opinion of the court.

This cause is before us on a bill of exceptions, filed by the Prosecuting Attorney of Fremont County and presented here by the Wyoming Attorney General, pursuant to §§ 7–288—7–291, W.S.1957. The bill challenges an order of the trial court dis-

missing for lack of jurisdiction a charge of first-degree murder against John Pius Moss, a member of the Northern Arapahoe Indian Tribe, for the killing of Eva Clara Holmes. The finding of the trial court is unquestioned that the alleged crime was committed on deceased's property within the limits of the City of Riverton on the corner of Fourth Street and Monroe Avenue, which property had formerly been an allotment of an 80-acre tract to the heirs (members of the Arapahoe Indian Tribe) of one All Sings, the land being later patented, sold to a white man, and thereafter dedicated to the City of Riverton. The court further found that the offense was one of those included in 18 U.S.C. § 1153 (Supp. V, 1965–1969), was committed within the exterior limits of the Wind River Indian Reservation—which is "Indian country" as described in 18 U.S.C. § 1151 —and hence was within the exclusive jurisdiction of the United States.

Facts as to the occurrences at the time of and immediately preceding the alleged crime are here unimportant since it is agreed by all concerned that the situs was, as found by the trial court, within the Riverton city limits. Accordingly, the sole question for determination is one of law, that is, whether the scene of the crime is under the jurisdiction of the United States or the State of Wyoming.[1]

The United States of America, through the Wyoming District Attorney, and the Shoshone and Arapahoe Tribes, acting jointly, were permitted on request to present briefs and argument amici curiae, the Government supporting the State's

views and the tribes those of defendant. A definitive resolution of the disputed point in addition to its immediate effect on the litigants is basic to future responsibility in the administration of justice and will depend in large measure on treaties and legislative history of the area to which we now allude.

By treaty of July 3, 1868, ratified in 1869, 15 Stat. 673, the Wind River Indian Reservation was established by the United States, embracing an area of approximately 3,000,000 acres and extending generally: "commencing at the mouth of Owl creek and running due south to the crest of the divide between the Sweetwater and Papo Agie rivers; thence along the crest of said divide and the summit of Wind River mountains to the longitude of North Fork of Wind river; thence due north to mouth of said North Fork and up its channel to a point twenty miles above its mouth; thence in a straight line to head-waters of Owl creek and along middle of channel of Owl creek to place of beginning." 15 Stat. at 674. This area included the present townsites of Thermopolis, Lander, and Riverton.

By the Brunot Agreement of 1872, ratified in 1874,[2] the United States purchased some 700,000 acres on the southern end of the 1868 reservation, wherein Lander is now located. In 1897,[3] a 10-mile square area of the northeastern portion of the reservation was purchased by the United States, Thermopolis falling in this ceded area.

By agreement of April 21, 1904, approved March 3, 1905, 33 Stat. 1016, here-

---

1. The specific exceptions were: "(a) That the finding of the Court, that the alleged murder took place upon a former Indian allotment, is immaterial and irrelevant and cannot, under the applicable law, support the Order of the Court; (b) That the finding of the Court, that all the area within the exterior limits of the Wind River Indian Reservation is 'Indian Country', except for the Riverton Reclamation Project, is erroneous, under the applicable law; (c) That the finding of the Court, that the said offense is one of the offenses included in

18 U.S.C.A., Section 1153 (as amended), is, in and of itself, irrelevant and immaterial, and cannot alone support the Order of the Court; (d) That the Order of the Court dismissing the Information and cause against the defendant, is erroneous, the same being in error in view of the evidence adduced in the above proceedings, and in view of the law presented to the Court at the above proceedings."

2. 18 Stat. 291.

3. 30 Stat. 62, 93.

after called the 1905 Act, approximately 1,480,000 acres of the reservation—over 50 percent—including the site of Riverton, was ceded to the United States, which cession is pivotal in the present controversy.

In 1934 the Secretary of the Interior was, with certain exceptions, authorized to restore to tribal ownership remaining surplus lands of any Indian reservation theretofore opened;[4] such lands under the 1905 Act were temporarily withdrawn from disposal;[5] and in 1939 Congress, inter alia, directed the Secretary of the Interior to establish land-use districts within the diminished and ceded portions of the Wind River Indian Reservation, to restore to tribal ownership all undisposed-of surplus or ceded lands within the land-use districts not under lease or permit to non-Indians, and to restore the balance of said lands progressively as the non-Indian owned lands within a given land-use district were acquired.[6]

In 1953 Congress provided compensation to the Shoshone and Arapahoe Tribes for certain lands of the Riverton reclamation project within the portion of the Wind River Indian Reservation ceded by the 1905 Act.[7] This project was a few miles northwest of the present town of Riverton, and the 1953 Act is relevant only peripherally for any bearing it may have had on the decision of this court in Blackburn v. State, Wyo., 357 P.2d 174.

To summarize the history for clearer understanding of our discussion, acts of Congress following agreements by treaty or otherwise with the Indians:

(a) In 1869 established the Wind River Indian Reservation;

(b) In 1874 confirmed the Brunot cession;

(c) In 1897 purchased additional lands within the original reservation;

(d) In 1905 secured by a cession from the Indian tribes all the lands north and east of Wind River and southeast of the Popo Agie, being something more than 50 percent of the reservation, hereinafter called the ceded portion, including the townsite of Riverton and the reclamation project;

(e) In 1939 authorized certain restoration of the lands ceded in 1905.

Ramified as is the recounted legislative and treaty history of the original reservation, the solution of our problem turns on two points, was the treaty and 1905 Act a disestablishment of the reservation as to portions ceded, and if so, what was the effect of the 1939 Act.

In its argument in support of the bill of exceptions, the State points out that: the land on which the alleged murder occurred was originally allotted to the heirs of All Sings in 1887; after the 1905 Act this allotment was among those lands in the ceded portion; it therefore fell within the exception to the Act requiring a trust deed to issue to those Indians claiming lands within the ceded portion; trust deed was issued to the heirs in 1907; in 1914 the land was sold by the heirs to a non-Indian and a fee patent issued from the Government on January 10, 1914; and in 1918 the land was annexed to the City of Riverton. The State argues that the fact the real property in question is presently in fee-simple title is important in order to demonstrate and prove that, under applicable law, jurisdiction over it is in the State of Wyoming, citing Blackburn v. State, supra, as holding under similar facts that the United States did not have exclusive jurisdiction over crimes committed on lands originally part of the Wind River Indian Reservation but presently in fee-patent ownership of a non-Indian. The State also points to the words in Article I of the 1905 Act whereby the Indians on the Wind River Reservation did "cede, grant, and relinquish to the United States, all right, title, and interest which they may have to all the lands embraced * * * [33 Stat. 1016]."

---

4. 48 Stat. 984.

5. 54 I.D. 559.

6. 53 Stat. 1128.

7. 67 Stat. 592.

The defendant on the other hand emphasizes Article IX of the Act, which provided the United States was not bound to purchase any of the land but would act as trustee to dispose of it, paying over to the tribes the proceeds, and refers often to their "title" rather than their *beneficial interest*. In his view the treaty and 1905 Act effected a trust arrangement. He, therefore, assumes without basis that the Indians retained title to the lands and proceeds from this premise to his desired answer that the crime here charged was within the provisions of 18 U.S.C. § 1153 (Supp. V, 1965–1969)[8] relating to offenses "within the Indian country" as such country is defined in 18 U.S.C. § 1151,[9] citing as controlling Seymour v. Superintendent of Washington State Penitentiary, 368 U. S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346, and Beardslee v. United States, 8 Cir., 387 F.2d 280.

In the Seymour case, the State of Washington had taken the position that a 1906 Act of Congress, 34 Stat. 80, implemented by a 1916 Presidential Proclamation, had wiped out the Colville Reservation, the Act having provided for the sale of mineral lands and settlement under the homestead laws of other surplus lands on the reservation after specified allotments to the Colville Indians. The Supreme Court observed, 368 U.S. at 355, 356, 82 S.Ct. at 427, that the 1906 Act referred to the Colville Reservation "in a manner that makes it clear that the intention of Congress was that the reservation should continue to exist as such. * * * The Act did no more than open the way for non-Indian settlers to own land on the reservation * * *";

pointed out that through the years since 1906 Congress had explicitly recognized the continued existence of Colville as an Indian reservation; and said that the state courts had erred in holding the 1906 Act dissolved the reservation. We see no parallel between that 1906 Act and the 1905 Act with which we are here confronted. It can, however, be said that Seymour clearly held the limits of a reservation are not diminished by the actual purchase of land within it by non-Indians or the dedication to the public interest of lands encompassed within an authorized townsite plot.

In the Beardslee case, a Sioux Indian, convicted of murder in the United States District Court under 18 U.S.C. § 1153, on appeal contended the Federal court to be without jurisdiction because the crime did not take place in "Indian country." Analysis shows that there the crime was committed within the original outer boundaries of the Rosebud Reservation but in a house on patented lands owned by a non-Indian in the town of Mission, South Dakota. Counsel's assertion that the facts are identical with the instant case is incorrect since there the crime did not occur in an area ceded to the United States by a treaty and ratified by Act of Congress as here. Accordingly, counsel's quotation from the case "Other courts almost uniformly have upheld federal jurisdiction or denied state jurisdiction, where the offense was committed by an Indian within the boundaries of a reservation but on particular land not owned by an Indian * * *," 387 F.2d at 286, is not germane to our situation. Nevertheless, the case is a valuable reference as will be explained later.

8. Section 1153 provides, inter alia, "Any Indian who commits against the person or property of another Indian or other person any of the following offenses, namely, murder, * * * within the Indian country, shall be subject to the same laws and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States."

9. Section 1151 defines "Indian country" as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and (c) all Indian allotments, the Indian titles to which have not been extinguished, * * *."

Although we accept, as hereinafter discussed, the State's view that the defendant's alleged crime was not committed within "Indian country," we do not agree that the Blackburn case is direct and adequate support for such position. There a different area, a portion of the Riverton reclamation project, was under consideration; and while that site had been a part of the cession effected by the 1905 Act, it had also been the subject of the 1953 Act providing compensation to the Shoshone and Arapahoe Tribes "deemed to constitute full, complete, and final compensation, * * * and extinguishing all of the right, title, estate, and interest * * * to the lands * * *," the trial court finding, inter alia, 357 P.2d at 178:

"'* * * When the Indian title to these lands was fully and finally extinguished by the Act of August 15, 1953, * * * jurisdiction, civil and criminal, over these lands passed from the United States to the State of Wyoming in all particulars * * *.'"

And on appeal this court said, 357 P.2d at 179, "Construing the Acts of Congress together, we think, as the trial court held, that the title of the Indians to the lands in the territory here involved has been extinguished * * *." (Emphasis supplied.) Thus, we there had for consideration the 1953 Act relating to the reclamation project, which is entirely foreign to the present discussion, and Blackburn cannot be said to have disposed of the question now before us.

In Beardslee v. United States, supra, Mr. Justice Blackmun noted, 387 F.2d at 286:

"* * * Federal jurisdiction is not present, of course, even though an Indian may be the defendant, where the offense site * * * is on a disestablished portion of a reservation however that disestablishment may have been effected. This is the obvious inferential holding of Seymour and is the direct holding in the following cases, among others: * * * See United States v. La Plant, 200 F. 92, 93 (D.S.D.1911). The Supreme Court

of South Dakota has so ruled repeatedly. * * * State ex rel. Hollow Horn Bear v. Jameson, 77 S.D. 527, 95 N.W.2d 181 (1959); * * * Lafferty v. State ex rel. Jameson, 80 S.D. 411, 125 N.W.2d 171 (1963); * * * State ex rel. Swift v. Erickson, 82 S.D. 60, 141 N.W.2d 1 (1966)."

The court in United States v. La Plant, D.S.D., 200 F. 92, was also faced with the question of whether or not on the date of an offense it was committed within an Indian reservation. Although various portions of the Act there construed (35 Stat. 460) do not make the case analogous to the one before us, it is significant that counsel argued no extinguishment of title had occurred in view of the fact that under Section 9 of the Act the Government was to act as trustee. The court rejected this, saying, 200 F. at 94:

"* * * That section declares that the United States does not guarantee to find a purchaser for the land, does not agree to buy the land, and acts only as trustee. But a trustee has not only the legal title, but he has also the right to possession, and the fact that the government is to act as trustee for the Indians does not indicate that their title has not been extinguished. There is nothing in section 9 providing that if the land is not sold it shall be turned back to the Indians. The government simply agrees to hold the money realized from the sale of the land, whenever it receives it, for the benefit of the Indians."

State ex rel. Hollow Horn Bear v. Jameson, 77 S.D. 527, 95 N.W.2d 181, was a habeas corpus proceeding by an enrolled tribal member of the Pine Ridge Indian Reservation, who questioned the jurisdiction of the state court, asserting it was without jurisdiction because the offense was committed within "Indian country" as defined by 18 U.S.C. § 1151. On the basis of United States v. Pelican, 232 U.S. 442, 34 S.Ct. 396, 398, 58 L.Ed. 676, and Putnam v. United States, 8 Cir., 248 F.2d 292, 294, the court held that the situs of the crime al-

though it had been within the original exterior boundaries of the Pine Ridge Indian Reservation was no longer Indian country and said, 95 N.W.2d at 184–185, that the Act (36 Stat. 440—parallel to the 1905 Act here before us) :

" * * * was motivated by a congressional purpose to reduce the area of Pine Ridge * * *. In effect it separated the reservation into two parts. That which the act denominates as the 'diminished' reservation, and which we elect to refer to as the 'closed' portion of the reservation, was to remain unchanged and to continue to serve the purposes of the government in protecting and dealing with the whole Indian population of the reservation as in the past. The remainder of the reservation, which we will refer to as the 'open' portion of the reservation, was to undergo change through a process of settlement into homesteads and townsites. It was contemplated that most of this surplus area would ultimately be settled, patented in fee, and cease to be a part of the reservation and within Indian country. There is no indication that allotted lands in this open area were reserved and excepted to serve the interests of the Pine Ridge Indians as a whole. It seems apparent that the principal reason for reserving these scattered outlying tracts was to permit the government to respond completely to its obligations to the respective allotees of these tracts. It is equally apparent that as the Indian title to each of these tracts was extinguished they would cease to serve in furthering any phase of the functions of the government in ministering unto its Indian wards. Thereafter such a tract would bear no different relation to those functions than would an adjoining tract of the open area, the Indian title to which had been extinguished by a homestead patent to a settler. Because the Congress obviously did not contemplate the use of these outlying allotted tracts for any purpose in connection with the superintendence and protection of its Indian wards after the Indian title thereto had been extinguished, we are persuaded that after such an extinguishment it intended they should cease to be both a part of the reservation and of the Indian country.

"The conclusion we have just expressed gains support from 18 U.S.C.A. § 1151, * * *. It will be observed that according to subsection (a) that 'Indian country' comprehends 'all land within the limits of any Indian reservation under the jurisdiction of the United States government, *notwithstanding* the issuance of *any* patent', but according to subsection (c) the term only comprehends such Indian allotments as 'the Indian titles to which have not been extinguished.' If subsection (a) is to receive a literal interpretation a patent to allotted lands within the limits of such a reservation which operated to extinguish the Indian title would not remove such a tract from Indian country, but under subsection (c) such a patent would so operate. Hence, it seems logical to believe that the Congress intended subsection (a) to apply to the closed area of reservations, and (c) to apply to allotted lands in open territory. That subsection (c) was intended to apply to allotments of Indian lands in just such an open area as is marked out by the Act of May 27, 1910, is indicated by the reviser's notes to § 1151, supra. It is there stated that 'Indian allotments were included in the definition on authority of the case of United States v. Pelican * * * [sic].' Pelican deals with an outlying allotment in such an open area. It was by subsection (c) that such Indian allotments were included in the definition of Indian country. However, only a single class of such allotted lands are described by subsection (c) viz. those to which 'the Indian titles to which have not been extinguished'. Thus under the familiar rule of express mention and implied exclusion, 82 C.J.S. Statutes § 333, p. 666, the statute failing to indicate a different intention, the inference fairly arises that other classes of allotments, viz. those to which 'the Indian ti-

tles have been extinguished', are excluded from the definition of Indian country."

This reasoning concerning subsection (c) of 18 U.S.C. § 1151 was followed in the Beardslee case, Mr. Justice Blackmun saying, 387 F.2d 287:

"* * * We regard clause (c) as applying to allotted Indian lands in territory now open and not as something which restricts the plain meaning of clause (a)'s phrase 'notwithstanding the issuance of any patent'. Although this result tends to produce some checkerboarding in non-reservation land, it is temporary and lasts only until the Indian title is extinguished. The congressional purpose and intent seem to be clear. See State ex rel. Hollow Horn Bear v. Jameson, supra, pp. 184–185 of 95 N.W.2d."

The holding in State ex rel. Hollow Horn Bear was again applied in State ex rel. Swift v. Erickson, 82 S.D. 60, 141 N.W.2d 1.

Lafferty v. State, 80 S.D. 411, 125 N.W.2d 171, considered whether the town of Dupree (wherein an area, not previously allotted to an Indian, had been the situs of an offense), once included in the Cheyenne River Indian Reservation, was still Indian country or whether an Act of May 29, 1908, 35 Stat. 460, had changed the character of the premises to non-Indian country. That Act was parallel to the 1905 Act under consideration here since Indians who had an allotment of land within the ceded territory had the right to surrender such allotment and select other land within the "diminished" reserve, the United States acting as trustee for the Indians in disposing of the specified lands; and the court held Congress had placed the area therein described outside the limits of the reservation so that the offense was not committed in Indian country.

These pronouncements, which we view as applicable to the instant situation, are a clear rebuttal to the sine qua non of defendant's contention, i.e., the agreement and 1905 Act had no effect on the area that was Indian country.

Passing to the 1939 Act, we observe that on its face it restored nothing but rather directed the Secretary of the Interior to restore in certain instances the ceded lands. No viable question of the state court's lacking jurisdiction because of the 1939 Act can be assumed, and the United States Attorney has presented an unchallenged addendum in his brief from the Area Director of the Bureau of Indian Affairs at Billings, Montana, having administrative control over the Wind River Indian Reservation, stating that none of the pertinent restoration orders included lands within the corporate limits of Riverton.

It follows that the trial court's finding the offense to have been committed in Indian country was erroneous.

Exceptions sustained.