556 P.2d 1185

**STATE of Idaho, Plaintiff-Respondent,**

v.

**Dianne C. (David) COFFEE, Defendant-Appellant.**

**No. 12040.**

Supreme Court of Idaho.

Nov. 23, 1976.

Neil O. Walter of Wilson & Walter, Bonners Ferry, John E. Echohawk, Boulder, Colo., for defendant-appellant.

Wayne L. Kidwell, Atty. Gen., T. J. Jones, III, Sp. Asst. Atty. Gen., Boise, Randall W. Day, Pros. Atty. of Boundary County, Bonners Ferry, for plaintiff-respondent.

McFADDEN, Chief Justice.

Defendant-appellant Dianne C. (David) Coffee was charged by a criminal complaint with two counts; (a) killing a deer out of season in violation of I.C. § 36–1403, and (b) killing a deer with the aid of an artificial light in violation of I.C. § 36–1301. Following stipulation as to the facts, Coffee moved for a dismissal based on her claim that she is an Indian and has an aboriginal right to hunt free from state regulation. The trial court denied the motion to dismiss, and Coffee was convicted on both counts. This court affirms.

Prior to trial, the following facts were agreed upon in a stipulation executed by defendant's attorney, an attorney for the Native American Rights Fund, the Boundary County Prosecuting Attorney, and an assistant Attorney General. The defendant is a member of the Kootenai Indian Tribe, a non-treaty, non-reservation [1] tribe recognized by the United States government. At about 8:50 p. m. on October 8, 1972, defendant shot and killed two white-tail deer on private property owned by Howe Farm in Boundary County, Idaho. The property where the deer were taken is located in the Kootenai Valley Drainage District # 11, Boundary County, Idaho. On October 8, 1972, deer hunting season was closed in that area; at the time the two deer were killed, the sun had set and the deer were

1. On October 18, 1974, property in Boundary County was set aside by the United States in trust for the benefit of the Kootenai Tribe of Idaho. Act of October 18, 1974, Pub.L. No. 93–458, 88 Stat. 1383.

spotted and shot with the aid of artificial light.

Although defendant stipulated to the facts constituting the offenses, she moved to dismiss the charges. In so moving, defendant contended that, as an Indian, she had an aboriginal right to hunt in the area traditionally occupied by her tribe without being bound by the game laws of the State of Idaho. Thus, she argued that she had committed no crime.

On July 18, 1973, trial to the court was held in the magistrate court. In addition to the stipulated facts, the court received testimony from the defendant and from an expert in Kootenai Indian Anthropology. In its memorandum opinion, the court denied the defendant's motion to dismiss and found her guilty of the two counts. The defendant then appealed to the district court, which issued its memorandum opinion based on the record of the proceedings in the magistrate court. The district court affirmed the decision of the magistrate court. Appeal was then perfected to this court.

The following undisputed evidence was established at trial in the magistrate court. The defendant is an enrolled member of the Idaho Kootenai Indian Tribe. The Idaho Kootenai, frequently referred to as the Bonners Ferry Kootenai, is one of five separate and distinct tribes historically referred to as Kootenai Indians. The tribe is traditionally identified with the Kootenai River drainage system, and it occupied most of what is now the northern tip of Idaho and a portion of northwestern Montana. The occupancy by the Idaho Kootenai was relatively exclusive, but other tribes were allowed to hunt and fish on the land without trouble.

The area occupied by the Idaho Kootenai was used primarily for residence and subsistence. The tribe gained sustenance mainly from fishing, although hunting, berry picking, trapping and root digging were also important. Deer were often taken for food and other uses. Tribal hunting was regulated by individuals known as hunt-leaders; these persons supervised the hunting in accordance with religious and traditional mandates. The control of the hunt-leaders was not absolute, and individuals could hunt at any time if necessity so demanded. After a tribal hunt, food was shared among members of the tribe, thus insuring that those unable to hunt would receive food. The tribe hunted only when necessary and used all game which was taken. Hunting for sport was unknown.

In uncontroverted testimony, defendant stated that she was hunting for food when the two deer were killed. The game was to be distributed among ten persons in her household and several other needy persons in the community. Defendant testified that she has never hunted for sport, only for necessity. Tribal members today continue to consider hunting to be indispensible for economic and cultural reasons.

On July 16, 1855, a treaty was entered into between the United States and certain Indian tribes at Hellgate, Montana, in the Bitter Root Valley. The treaty was ratified by the Senate in executive session on March 8, 1859, and proclaimed by President Buchanan on April 18, 1859. 12 Stat. 975. The treaty was negotiated for the government by Gov. Isaac Stevens, and by headmen of the Flathead, Upper Pend d'Oreille, and "Kootenay" tribes. Several "Kootenay" Indians signed the treaty, including Chief Michelle, Gun Flint, Little Michelle, Paul See, and Moses. Apparently none of those claiming to represent the "Kootenay" were members of the Idaho Kootenai, and that separate tribe was not represented at the treaty negotiations or by signature. Nonetheless, the land ceded by the Indians in the treaty included the Kootenai River drainage system, the area occupied by the Idaho Kootenai.

Subsequently, in 1957, the United States Indian Claims Commission considered the various aspects of ownership of the land and the right of the Idaho Kootenai to compensation in Kootenai Tribe or Band of Indians of the *State of Idaho v. United States,* Docket No. 154. In an opinion

published at 5 Ind.Cl.Comm. 456 (1957), the Commission found that although the Idaho Kootenai were not parties to the treaty, Indian title to the land had nonetheless been extinguished by the United States with the ratification of the Hellgate treaty by the Senate in 1859. The Commission then ruled that the tribe was entitled to compensation for the value of the land as of 1859. The Commission later accepted an agreement between the Kootenai and the Government settling the ownership and compensation questions. 8 Ind.Cl.Comm. 504 (1960). These decisions will be discussed in more detail later. The case was for a time consolidated with and later separated from a claim of the Confederated Salish and Kootenai Tribes of the Flathead Reservation (a different Kootenai band), discussed at 8 Ind.Cl.Comm. 40 (1959); that Commission opinion is not relevant to the instant case.

The issue presented in this case is whether present-day Kootenai Indians have a right to hunt on private land, free from state regulation. In disposing of this issue, we consider whether there was an aboriginal right to hunt, whether the right survives today and if so on what terms, and whether defendant Coffee was properly exercising existing rights so as to be protected from state regulation.

## THE ABORIGINAL RIGHT

The concept of aboriginal title is well established.

"[T]he right of sovereignty over discovered land was always subject to the right of use and occupancy and enjoyment of the land by Indians living on the land. This right of use and occupancy by Indians came to be known as 'Indian title.' It is sometimes called 'original title' or 'aboriginal title.'" *Sac and Fox Tribe v. United States,* 383 F.2d 991, 997 (Ct.Cl. 1967), *cert. den.* 389 U.S. 900, 88 S.Ct. 220, 19 L.Ed.2d 217 (1967).

We find a paucity of opinions on the subject of whether the rights to hunt and fish are included among the rights of aboriginal title.

Aboriginal title was founded on the notion that Indian occupancy and use of the land prehistorically predated the present sovereign. Justice demanded that until some more compelling exigence was recognized, the Indian should be allowed to continue his way of life on his traditional tribal lands. Thus, the aboriginal title was more than just a right to remain camped on the land. It was a right to continue, at least temporarily, a way of life. To the extent that hunting or fishing was an integral part of the Indian's way of life prior to the coming of the white man, it became a part of the way of life allowed to continue after establishment of the sovereign. Thus, hunting and fishing rights are part and parcel with aboriginal title. In *Pioneer Packing Co. v. Winslow,* 159 Wash. 655, 294 P. 557 (1930), the court held that Indians own reservation fish "by the same title and in the same right as they owned them prior to the time of the making of the treaty." Further, treaties provide for retention by the Indians of hunting and fishing rights, both on and off the reservation, indicating that hunting and fishing rights are a part of the aboriginal title which may be ceded by treaty or reserved by the Indians.

Respondent attempts to refute this proposition on the authority of *Tlingit and Haida Indians v. United States,* 389 F.2d 778, 182 Ct.Cl. 130 (1968). In *Tlingit,* the Court of Claims reversed an award of damages for the loss of exclusive fishing rights, holding, *inter alia,* that "there are no fishing rights based on aboriginal ownership of the land * * *." A close examination of *Tlingit* reveals that the court's conclusion lacks foundation. Although the court asserts that "we have previously concluded that aboriginal fishing rights did not exist," they failed to cite authority to support this proposition. Further, that conclusion appears to have been based upon the court's opinion that "navigable waterways have never been the prop-

erty of adjacent land owners," and the court's reasoning would thus limit the decision to cases involving the taking of fish from navigable waterways. At any rate, this language is mere dicta since the right to compensation for loss of a right depends solely on whether there is a "clear statutory directive creating a right to compensation," and the court concludes that the right to migratory fish is not a compensable statutory right.

We hold that, where established by historical use, aboriginal title includes the right to hunt and fish and, where those rights have not been passed to the United States, by treaty or otherwise, the rights continue to adhere to the current members of the tribe which held them aboriginally. The right may be regulated by the State, but only if a need for such conservation is shown by the State. *State v. Tinno*, 94 Idaho 759, 497 P.2d 1386 (1972).

In the present case, the uncontroverted testimony before the magistrate tended to prove the existence of such a right of the Idaho Kootenai Indians based on historical use patterns. The next step is to determine whether those rights have been extinguished or in any other way limited.

## EXTINGUISHMENT OF THE KOO-TENAI ABORIGINAL HUNT-ING RIGHT

Once established, an extinguishment of Indian rights "cannot be lightly implied." *United States v. Santa Fe Pac. R. Co.*, 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). It is well established that only the United States government, in its capacity as the sovereign, can extinguish the Indian right to their historical land.

"It very early became accepted doctrine in this Court that although fee title to the lands occupied by Indians when the colonists arrived became vested in the sovereign—first the discovering European nation and later the original States and the United States—a right of occupancy in the Indian tribes was nevertheless recognized. That right, sometimes called Indian title and good against all but the sovereign, could be terminated only by sovereign act. Once the United States was organized and the Constitution adopted, these tribal rights to Indian land became the exclusive province of the federal law. Indian title, recognized to be only a right of occupancy, was extinguishable only by the United States." *Oneida Indian Nation v. County of Oneida, N. Y.*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974).

By far the most usual method of terminating Indians rights was by treaty.[2] In treaty situations, the Government and the Indian tribes were able to negotiate and reach common grounds of agreement. The Indians gave up their land and in return the United States agreed to specified conditions, usually payment of moneys or provision of services. The Indians could negotiate to give up only those parts ·of the land, or those rights, which they desired to surrender, and could keep such other areas or rights as they desired to retain. Thus, treaties normally retained land for occupancy, the "reservation," and often allowed the Indian some form of hunting and fishing right.[3] The relative rights of present-day Indians and the various states can be determined by construction of a treaty, much the same as a contract is construed

---

2. *See, e. g., Antoine v. Washington*, 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *Oneida Indian Nation v. County of Oneida, N. Y.*, 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *Tee-Hit-Ton Indians v. United States*, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955); *State v. McConville*, 65 Idaho 46, 139 P.2d 485 (1943); *State v. Arthur*, 74 Idaho 251, 261 P.2d 135 (1953); *State v. Tinno*, 94 Idaho 759, 497 P.2d 1386 (1972).

3. *See, e. g.*, Treaty with the Six Nations, 7 Stat. 15, 33, 44; Treaty Between United States and Nez Perce Indians, 12 Stat. 957; Treaty with the Qui-nai-ells, 12 Stat. 971; Treaty with Indians of Middle Oregon, 12 Stat. 963; Treaty with the Yakimas, 12 Stat. 951; Treaty with the Walla-Wallas, 12 Stat. 945; Treaty with the Flathead, 12 Stat. 975.

when dispute or ambiguity arises. *See, e. g., Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975); *State v. Arthur,* 74 Idaho 251, 261 P.2d 135 (1953).

In the instant case, however, there is no negotiated treaty; as counsel for the defendant asserts, this case is relatively unique in that most Indian tribes ceded their land by treaty. Here, however, we cannot look to what the Kootenai did or did not cede or reserve because they were not parties to the treaty.

■ The Indians Claims Commission considered the question of whether the United States had extinguished the Indian title of the Kootenai tribe to the property in the Kootenai River drainage system in the *Kootenai Tribe or Band of Indians of the State of Idaho v. United States,* 5 Ind. Cl.Comm. 456 (1957). The Commission concluded that although the Idaho Kootenai had not been signatories to the treaty, Senate ratification of the treaty constituted an extinguishment by Congress of the tribe's rights to the land. 5 Ind.Cl.Comm. at 474–477. That conclusion was based on the Commission's belief that the United States has the power, as sovereign, to extinguish aboriginal title even absent a treaty. The Commission relied upon *Lone Wolf v. Hitchcock,* 187 U.S. 553, 23 S.Ct. 216, 47 L.Ed. 299 (1903), and the *Creek Nation v. United States,* 302 U.S. 620, 58 S.Ct. 384, 82 L.Ed. 482 (1938), and held:

"The intention of the defendant [United States] to extinguish the Kootenai title by the 1855 treaty is evidenced by the fact that their lands were included in the area ceded. The treaty also provided and required the Indians in the territory ceded to move to the reservation set aside for them and as to the ancestors of members of the [Kootenai] tribe, negotiations extended over several years for giving them allotments in the area they now and did then claim as their ancestral home, under section 4 of the allotment act of February 8, 1887, 24 Stat. 388. Apparently such allotments were made. Section 4 of said act provided for allotments on lands to which Indian title had been extinguished and is therefore evidence of the Government's view that the lands on which the allotments were made had been ceded by the 1855 treaty.

In these circumstances, we must consider the date, March 8, 1859, on which the July 16, 1855 treaty was ratified as the time the defendant acquired the Indian aboriginal rights to the lands involved here. * * * On March 8, 1859, the treaty freed the lands from the possessory rights of the petitioners." 5 Ind.Cl. Comm. at 475–76.

We have examined the analysis of the Commission and we are in agreement with its conclusion.

In *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), the United States Supreme Court described the nature of aboriginal rights and the power of the United States to extinguish those rights:

"The nature of aboriginal Indian interest in land and the various rights as between the Indians and the United States dependent on such interest are far from novel as concerns our Indian inhabitants. It is well settled that in all the States of the Union the tribes who inhabited the lands of the States held claim to such lands after the coming of the white man, under what is sometimes termed original Indian title or permission from the whites to occupy. That description means mere possession not specifically recognized as ownership by Congress. After conquest they were permitted to occupy portions of territory over which they had previously exercised 'sovereignty,' as we use that term. This is not a property right but amounts to a right of occupancy which the sovereign grants and protects against intrusion by third parties but which right of occupancy may be terminated and such lands fully disposed of by the sovereign itself without any legally enforceable obligation to

compensate the Indians." *Tee-Hit-Ton Indians v. United States,* 348 U.S. at 279, 75 S.Ct. at 317.

See, *Johnson v. McIntosh,* 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823).

In *United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941), governmental power to extinguish Indian title was crystalized:

"The manner, method and time of such extinguishment raise political not justiciable issues. \* \* \* whether it be done by treaty, by the sword, by purchase, by the exercise of complete dominion adverse to the right of occupancy, or otherwise, its justness is not open to inquiry in the courts." 314 U.S. at 347, 62 S.Ct. at 252.

The scheme of government dealings with aboriginal Indian title as defined by the courts has rendered the Indian aboriginal right of occupancy "essentially a revocable privilege granted by the United States." Indian Title: The Rights of American Natives in Lands They Have Occupied Since Time Immemorial, 75 Col.L.Rev. 655 (1975).

"Federal control over the disposition of Indian lands implied, in practical terms, the right to 'extinguish' by purchase or conquest, the Indian's title or right of occupancy. This power lodged exclusively in the Congress, which could even arbitrarily appropriate Indian title land as an exercise of authority unreviewable by the courts." 75 Col.L.Rev. 655, 660.

See, *Johnson v. McIntosh, supra; Tee-Hit-Ton Indians v. United States, supra; Lone Wolf v. Hitchcock, supra; Creek Nation v. United States, supra; Shoshone Tribe v. United State*s, 299 U.S. 476, 57 S.Ct. 244, 81 L.Ed. 360 (1937); *United States v. Creek Nation,* 295 U.S. 103, 55 S.Ct. 681, 79 L.Ed. 1331 (1935); *Menominee Tribe v. United States,* 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); *United States v. Kabinto,* 456 F.2d 1087 (9th Cir. 1972); *Uintah & White River*

*Bands v. United States,* 152 F.Supp. 953, 139 Ct.Cl. 1 (1957).

■ We also agree with the Indian Claims Commission that the Senate terminated aboriginal rights in 1859 with the ratification of the Hellgate treaty. The treaty was consented to by the Senate on March 8, 1859, proclaimed by the President on April 18, 1859, and signed by the Senate on July 16, 1859. Because the decision to consent to the treaty was made in executive session, we are unable to find any expression of the Senate's intentions in ratifying the treaty. Nonetheless, we can infer the intended effect from the ratification itself.

On its face, a ratification does nothing more than accept the terms of the negotiated agreement; no taking or extinguishment is apparent on the face of a ratification. Part of the land ceded by the Indians and accepted by the Senate did not belong to the signatories and was not theirs to give. If the effect of the treaty was merely to accept the land from the Indians, then no extinguishment could be implied from the ratification to establish a governmental right in land invalidly ceded. However, ratification of a treaty has more effect than mere acceptance.

■ It is apparent that the government intended by the 1859 treaty ratification to pay a certain sum of money and assume other obligations, and in return to receive specified lands, including the Kootenai River drainage system occupied by the Idaho Kootenai. Whether the Indians signing the treaty had the power to give the land away is not relevant. The United States did have the power to take the land, and when it said it was receiving the land, the effect was that the land was taken. Remembering that the Indian title is only a revocable right of occupancy granted by the United States, it is inferable in any Indian treaty that the government intends to take the land ceded in the treaty. A treaty, when made effectual, becomes the law of the land as much as any legislation.

U.S.Const. Art. 6. By ratifying the treaty and terms of the treaty by which the United States took possession of the relevant land, the Senate put the force of law into the taking of the land. Thus, Indian title was extinguished on July 16, 1859, when the treaty ratification expressed the congressional intent to take possession of the land.[4]

It is apparent that the Idaho Kootenai recognize and accept this taking. In the Indian Claims Commission Act of 1946, 25 U.S.C. § 70a (1970), the United States provided statutory compensation for lands taken by the government from the Indians. The Idaho Kootenai took advantage of this right to compensation when it filed its claim with the Indian Claims Commission. 5 Ind.Cl.Comm. 456. In filing that claim, the Idaho Kootenai, in effect, admitted the taking of their lands by the United States; this is the necessary implication in that they could not be entitled to any compensation unless the lands had been taken. It would appear from the opinion of the Commission that the Kootenai never disputed the taking, as all argumentation before the Commission appears to deal with the question of *when* the land was taken, and not *whether* title had been extinguished. 5 Ind.Cl.Comm. 456, 474–477. In that action, then, not even the Kootenai denied that the United States had extinguished the aboriginal title to the land.

We next consider the terms and extent of the termination. Defendant contends that even if aboriginal title to the land was terminated, aboriginal title to hunting rights were not mentioned in the ratification of the 1855 treaty. Defendant maintains the right to hunt survives and has never been relinquished by the Kootenai.

We disagree. The Senate ratification of the treaty in 1859 expressed its intent to terminate the Indian title to the land described in the treaty and equally expressed its intent to leave certain rights untouched. The treaty excepts from cession certain lands reserved for occupancy by the signatory tribes, and also certain other rights:

"The exclusive right of taking fish in all the streams running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places, in common with citizens of the Territory, and of erecting temporary buildings for curing; together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon open and unclaimed land." 12 Stat. 975, 976.

The relevant language of the treaty is that portion granting a continuing right to hunt upon "open and unclaimed land." It is inferable from the mention of the specific reservation, a right to hunt on open and unclaimed land, that the Senate intended to take the right to hunt on other lands; a specific exception gives rise to an infer-

---

4. An examination of the Official Proceedings of the Council held with the Flathead, Kootenay and Upper Pend O'relle Indians commencing July 7 and ending July 16, 1855, Isaac I. Stevens, Gov. & Supt. Indian Affairs, Washington Ty. (Nat'l Archives), transmitted to the Commissioner on Indian Affairs in a letter dated July 16, 1855 (Nat'l Archives), reveals that the decision to take the land was, in effect, made prior to initiation of treaty negotiations at Hellgate. In council, all discussion centers on the location of the reservation. No discussion occurred as to whether Indian land would be ceded. The mood expressed by the Indians was one of underlying fear, and the cession of the land seemed to be assumed throughout the council. The boundaries of the tribal lands was never discussed. This court recognizes in those proceedings a prior decision on the part of government agents to take certain lands; the treaty negotiation actually did little more than secure Indian approval of the compensation to be paid and determine which of two areas would be set aside as a reservation. Ratification of the treaty had the effect of putting the force of law into a governmental decision which appears to have been made long before the July, 1855 treaty council.

ence that the general contains all else.[5] Thus, that right to hunt not reserved was taken by the United States. However, it is equally important to recognize that some hunting right does survive. The clear intent of the language approved and adopted by the Senate is to leave the right to hunt on open and unclaimed land untouched; this right remains unextinguished and survives to the benefit of present-day Idaho Kootenai.

This result was also reflected by the Kootenai claim before the Indian Claims Commission in 1957. Initially, the Commission rendered a finding that the government had extinguished Kootenai title to the land; an interlocutory opinion was filed on August 9, 1957, 5 Ind.Cl.Comm. 456, but no judgment was entered. Before further adjudication by the Commission as to the value of the land, a settlement was reached between the Kootenai and the United States. That settlement was reviewed and accepted by the Commission, 8 Ind.Cl.Comm. 504, and judgment was entered.

The effect of the settlement was that the Kootenai gave up any right to any further claim against the government, in return for payment of $425,000.00:

> "Entry of final judgment in said amount shall finally dispose of all rights, claims or demands which petitioner has asserted, or could have asserted, with respect to the subject matter of this claim, and petitioner shall be barred thereby from asserting any such right, claim or demand against defendant in any future action."

The tribe thus declared as satisfied any claim of right "with respect to the subject matter of this claim." The Commission in its opinion notes that the subject matter of the claim is "payment of any compensation to said Indians for their lands." While it is certain that the Indians have abandoned all claims of remaining right to the "land," it is not clear what "land" means in this context.

 Normally, "land" means a property right and includes all things physical upon the earth, such as soil, trees, and grass. *Reynard v. City of Caldwell,* 55 Idaho 342, 42 P.2d 292 (1935). However, these meanings are inappropriate here. The Indians held no general interest in the sense normally associated with the use of the word "land." What they did own was a right of occupancy which was revocable at the will of the government. In the context of the Commission settlement, "lands" means that which was discussed in the claim and the Commission's decision: the land as taken by the government in the treaty ratification. As we have noted earlier, the treaty terminated all rights except those specifically excluded. Thus, the settlement prohibits the Indians from claiming any hunting right in the land except the right to hunt on open and unclaimed land.

 We conclude, then, that the aboriginal right to occupy the Kootenai River drainage system once held by the Idaho Kootenai was extinguished in 1858 when the United States took those lands, under the terms of the Treaty of Hellgate. The extent of the extinguishment was defined in accordance with Congressional intent by the terms of the treaty. The Kootenai, as with the signatory tribes, were left a right to hunt upon open and unclaimed land. We next look to determine whether defendant Coffee was properly exercising

---

5. "It is a universally recognized rule of construction that, where a constitution or statute specifies certain things, the designation of such things excludes all others." *Peck v. State,* 63 Idaho 375, 120 P.2d 820 (1941); *Poston v. Hollar,* 64 Idaho 322, 132 P.2d 142 (1942). This principle is expressed in the legal maxim "expressio unius est exclusio alterius." See, *Noble v. Glenn's*

*Ferry Bank, Ltd.,* 91 Idaho 364, 421 P.2d 444 (1966), wherein the doctrine is discussed. Consistent with the application of expressio unius set forth in *Noble,* we deem that "consonant with reason and good discretion," the 1859 ratification should be read to save only the right to hunt on open and unclaimed land, while extinguishing other hunting rights.

this right at the time of the offenses, and if not, whether she was subject to the Idaho State game laws.

## DEFENDANT'S RIGHT TO HUNT UNREGULATED UPON PRIVATE LAND

■ This court decided the meaning of a right to hunt on "open and unclaimed land" in *State v. Arthur*, 74 Idaho 251, 261 P.2d 135 (1953):

"It will at once become apparent that the meaning of 'open and unclaimed land', as employed in the treaty, becomes more meaningful. It was intended to include and embrace such lands as were not settled and occupied by the whites under possessory rights or patent or otherwise appropriated to private ownership * * *." 74 Idaho 251, 261, 261 P.2d 135, 141.[6]

In that case, the defendant was hunting on federal land which was open and unclaimed, and this court held he could not be subjected to State regulation. Here, however, the defendant admitted she was hunting on private land. Land which is privately owned is not open and unclaimed. Thus, even though the defendant's tribe retained a right to hunt on open and unclaimed land, defendant did not have a surviving aboriginal right to hunt on private land.[7]

■ The right of a state to regulate hunting in general has often been upheld as a valid exercise of the state's police power in pursuit of the objective of preserving the state's natural resources. *Geer v. Connecticut*, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896); *Foster Fountain Packaging Company v. Haydel*, 278 U.S. 1, 49 S.Ct. 1, 73 L.Ed. 147 (1928); *Toomer v. Witsell*, 334 U.S. 385, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948); *Takahashi v. Fish and Game Commission*, 334 U.S. 410, 68 S.Ct. 1138, 92 L.Ed. 1478 (1948). Once the Federal Government has extinguished the aboriginal title of the Indian, and absent any treaty provision to the contrary, the state may properly regulate the hunting activities of the Indian.[8] See, *Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 93 S.Ct. 1267, 36 L.Ed.2d 114 (1973).

■ Had defendant been hunting on open and unclaimed land, a motion to dismiss might have been justified, depending on whether the State could show a need to regulate the hunting. See, *State v. Tinno, supra*. However, as she was hunting on

---

6. In *State v. Arthur*, we examined the language used by Gov. Stevens and various Indian headmen at the treaty council to determine the understanding extant at the negotiation as to the meaning of "open and unclaimed land." In the instant case, similar expressions of governmental intent as to the meaning of these words are found in Gov. Stevens' speech to the Indians at Hellgate, contained in the Official Proceedings of the Council, supra, n. 4: "In the treaty besides providing for your having a tract of land for your homes, you will have the privilege of going on to the land you have sold to get roots and berries and to kill game except where the land is actually occupied by a white settler." Official Proceedings, National Archives Transcribed Copy, p. 5.

7. This case does not present the question of when a state may impose game regulations on Indians exercising surviving aboriginal rights to hunt, and is thus distinguishable from most cases dealing with the right of Indians to hunt and fish in a manner contrary to State law. *Antoine v. Washington, supra; Puyallup Tribe v. Dept. of Game*, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968); *Dept. of Game v. Puyallup Tribe*, 414 U.S. 44, 94 S.Ct. 330, 38 L.Ed.2d 254 (1973); *Tulee v. Washington*, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); *United States v. Winans*, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905); *State v. Tinno, supra; State v. Arthur, supra; State v. McConville, supra.*

8. The courts below relied on *State v. Quigley*, 52 Wash.2d 234, 324 P.2d 827 (Wash.1958), to support this proposition. Although that opinion is somewhat terse, and reason underlying it is not clear, it does seem to stand for the proposition that a state may impose fish and game regulations upon Indians killing deer on land which is private land because aboriginal title to that land has been extinguished.

private land, she was subject to state game laws.

The trial court properly denied defendant's motion to dismiss. Affirmed.

SHEPARD and BAKES, JJ., and SCOGGIN, District Judge, Ret., concur.

DONALDSON, Justice (dissenting).

The appellant was charged in a criminal complaint with killing a deer out of season in violation of I.C. § 36–1403 and killing a deer with the aid of an artificial light contrary to I.C. § 36–1301. She stipulated to the charges but moved to dismiss the complaint on the grounds that as an enrolled member of the Idaho Kootenai she had an aboriginal right to hunt in the area free from state regulation. The parties stipulated that the land on which the violations allegedly occurred were within the territorial boundaries of the Idaho Kootenai's aboriginal hunting grounds. Nevertheless, the majority affirmed the district court's decision denying appellant's motion to dismiss.

Being unable to agree with the conclusion reached by the majority, I respectfully dissent. The critical issue presented in this case is whether there was an extinguishment of the Idaho Kootenai's aboriginal title to the lands in question. I agree with the majority that case law establishes the concept of aboriginal title. As the United States Court of Claims said in *Sac & Fox Tribe v. United States,* 383 F.2d 991, 997, 179 Ct.Cl. 8 (1967), *cert. denied,* 389 U.S. 900, 88 S.Ct. 220, 19 L.Ed.2d 217 (1967) :

> "[T]he right of sovereignty over discovered land was always subject to the right of use and occupancy and enjoyment of the land by Indians living on the land. This right of use and occupancy by Indians came to be known as 'Indian title.' It is sometimes called 'original title' or 'aboriginal title.' "

I also agree with the majority that aboriginal title includes not only a possessory interest in the land but where established by historical use, the right to hunt and fish. Finally, I agree with the majority that case law establishes that the United States Government in its capacity as the sovereign can extinguish the Indians' right to their historical land either by treaty or by sovereign act absent a treaty.

I disagree with the majority's conclusion that extinguishment took place in this case, however. Once established, an extinguishment of Indian rights "cannot be lightly implied." *United States v. Santa Fe Pac. R. Co.,* 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). The Idaho Kootenai were not parties to the Hellgate Treaty. As the majority opinion acknowledges, they could not therefore be affected by the treaty. The majority reaches the identical result, however, by maintaining that *ratification* of the Hellgate Treaty terminated whatever rights the Idaho Kootenai had in the land. To quote the majority,

> "Remembering that the Indian title is only a revocable right of occupancy granted by the United States, it is inferable in any Indian treaty that the government intends to take the land ceded in the treaty."

It is true that the United States had the inherent power as sovereign to take the Idaho Kootenai's land absent a treaty. Once the United States elected to enter into a formal treaty, however, whether extinguishment occurred has to be determined by the terms of the treaty. To hold otherwise would render the treaty process nugatory. Since the Idaho Kootenai were not parties to the Hellgate Treaty, there could be no extinguishment of their rights under the treaty. Case law establishes that Indian title is not a property right, but is a right of occupancy which the sovereign grants and protects against intrusion by third parties. This right of occupancy may be terminated without any legally en-

forceable obligation to compensate the Indians. *Tee-Hit-Ton Indians v. United States,* 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955). But in order to extinguish Indian title by sovereign act, the sovereign must affirmatively do so. Extinguishment cannot be "lightly implied." In this case the only alleged sovereign act was the ratification of a treaty that did not purport to affect the Idaho Kootenai. Since the treaty did not purport to affect the Idaho Kootenai, its ratification could not affect the Idaho Kootenai.

The Idaho Kootenai retained their aboriginal rights *in toto* after the ratification of the Hellgate Treaty until the tribe's possessory interest was extinguished when the Indian Claims Commission awarded the Idaho Kootenai compensation for the loss of their land. *Kootenai Tribe v. United States,* 5 Ind.Cl.Comm. 456 (1957). It is important to note, however, that there were no statements concerning the Idaho Kootenai's hunting and fishing rights in the Commission's decision. Those rights were therefore not extinguished. In *United States v. Winans,* 198 U.S. 371, 381, 25 S.Ct. 662, 664, 49 L.Ed. 1089 (1905), the United States Supreme Court took the view that treaties were "not a grant of rights to the Indians, but a grant of rights from them,—a reservation of those not granted." It follows that although the effect of the Indian Claims Commission's decision was to extinguish the Kootenai's right of possession, their other aboriginal rights including the right to hunt were not affected.

It is well established that the exclusive right to extinguish Indian rights based upon aboriginal occupancy belongs to the United States. *Oneida Indian Nation v. County of Oneida,* 414 U.S. 661, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *United States v. Santa Fe Pac. R. Co., supra.* State regulations which have the effect of extinguishing aboriginal Indian rights are invalid under the supremacy clause of the United States Constitution. As the Idaho Su-

preme Court observed in *State v. Arthur,* 74 Idaho 251, 261 P.2d 135 (1953), *cert. denied,* 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087 (1954), if an Indian's right to hunt and fish were limited to certain times of the year in common with all other citizens "his otherwise ancient right recognized by the treaty and never extinguished would for all practical purposes be extinguished." That case involved Indian rights that were protected by a formal treaty with the United States. But identical considerations apply to aboriginal rights that are not protected by formal treaty. Only the United States has the authority to extinguish Indian rights. Whether Indian rights are recognized by treaty, statute, or other formal government action is of no consequence in this respect. The origin of all Indian rights is the same—the aboriginal title that can be terminated only by sovereign act.

The criminal complaint charging appellant with killing a deer out of season and killing a deer with the aid of an artificial light should have been dismissed. As an enrolled member of the Idaho Kootenai, appellant had an aboriginal right to hunt within the territorial boundaries of the Idaho Kootenai's aboriginal hunting grounds. That right could not be affected by I.C. § 36-1403 and I.C. § 36-1301.

This dissent recognizes the legitimate interest of the state in conserving its natural resources, particularly in areas no longer subject to exclusive Indian occupancy. Similar concerns prompted the United States Supreme Court to allow limited state regulation of off-reservation treaty hunting and fishing rights where the regulations were "in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians * * *." *Puyallup Tribe v. Dept. of Game,* 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968). *See also* Burnett, "Indian Hunting, Fishing and Trapping Rights: The Record and the Controversy," 7 Id.L.R. 49 (1970); *United States v. Washington,* 520 F.2d 676 (9th

Cir. 1975), *cert. denied,* 423 U.S. 1086, 96 S.Ct. 877, 47 L.Ed.2d 97 (1976). In *State v. Tinno,* 94 Idaho 759, 497 P.2d 1386 (1972), the Idaho Court accepted this standard in an off-reservation treaty case and required the state to "clearly [prove] regulation of the treaty Indians' fishing in question to be necessary for preservation of the fishery." This standard is equally applicable to hunting rights.

Although the present case does not involve treaty protected rights I believe the standards adopted by the Court in *State v. Tinno, supra,* to be an appropriate means of assuring preservation of the species while avoiding extinguishment of the Kootenai Indians' right to hunt which they have held since aboriginal times. It is also a standard which by now is familiar to the state, a standard which they must already meet in treaty cases.

Statutes are not presumptively valid under this standard. *State v. Tinno, supra.* In the present case the state has failed to present evidence that hunting by Kootenai Indians presented a threat to white-tail deer or that the statutes in question were "in any way necessary or even useful for the conservation of deer." *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975). Evidence was produced to show that there are presently fewer than 75 Kootenai Indians in Idaho. Their incomes are generally below average and hunting is often essential to provide an adequate diet for them. In the present case appellant testified she shot the deer to provide food for a number of people in her household. In *State v. Tinno, supra,* 94 Idaho at 765, 497 P.2d at 1392, the Court recognized that "Indians have subsistence and cultural interests in hunting and fishing that are rooted more deeply than the recreational interests asserted by sportsmen." Absent a showing that subsistence hunting by so few would be a threat to the preservation of white-tail deer, the statutes in question, insofar as they purport to affect the Idaho Kootenai, are invalid.