**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
               *Plaintiff-Appellee,*

v.

CLYDE DEWAYNE HOLMES, JR.,
              *Defendant-Appellant.*

No. 09-30211

D.C. No.
1:08-CR-00147-
BLW-1

OPINION

Appeal from the United States District Court
for the District of Idaho
B. Lynn Winmill, Chief District Judge, Presiding

Argued and Submitted
May 5, 2010—Portland, Oregon

Filed June 16, 2011

Before: Alex Kozinski, Chief Judge, Andrew J. Kleinfeld
and Sandra S. Ikuta, Circuit Judges.

Opinion by Chief Judge Kozinski;
Concurrence by Judge Kleinfeld

## COUNSEL

Jay J. Kiiha (argued), Capitol Law Group, PLLC, Boise, Idaho, for the defendant-appellant.

Thomas E. Moss, United States Attorney, Monte J. Stiles and Syrena C. Hargrove (argued), Assistant United States Attorneys, Boise, Idaho, for the plaintiff-appellee.

## OPINION

KOZINSKI, Chief Judge:

What does it mean to destroy land?

### Facts

A jury convicted Clyde DeWayne Holmes, Jr., a volunteer fireman, on six counts of setting public lands afire, in violation of 18 U.S.C. § 1855. He burned about a thousand acres

owned by the Bureau of Land Management (BLM) that were covered by sagebrush and other vegetation. At sentencing, Holmes argued that his offense "did not include the destruction or attempted destruction of a place of public use," which carries a base offense level of 24. *See* U.S.S.G. § 2K1.4(a)(1). The district court rejected this argument and sentenced Holmes to 72 months. We review the district court's interpretation of the Guidelines de novo, its application of the Guidelines to the facts for abuse of discretion and its factual findings for clear error. *See United States* v. *Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006).

**1.** Holmes argues that he didn't destroy or attempt to destroy *a place of public use*, but he waived the issue by conceding it below: "Yeah, and like I said, I don't disagree that it's a place of public use. Obviously it's open to the public but it just seems that . . . [the arson] endangered a place of public use . . . ." We decline to address it. *See Fed. Sav. & Loan Ins. Corp.* v. *Butler*, 904 F.2d 505, 509 (9th Cir. 1990).

**2.** Holmes argues that the burning of grass and sagebrush didn't *destroy* the land because there's no evidence "that a member of the public was denied usage [sic] of the land for some higher cultural or recreational purpose," or "that the land itself was . . . rendered unusable into the indeterminate future." Rather, the land's "ability and use was only limited for a short period of time."

The Guidelines don't explain what it means to destroy something, but we have a pretty good idea from common usage. Drop a Ming vase, and it's kaput. Spill some milk on your computer, and you'll have something to cry over. And Rover will surely destroy your Jimmy Choos if you give him half a chance. But it's hard to think of examples where land is destroyed. A large explosion might dissipate some of the dirt and leave a crater; dumping toxic waste might render land uninhabitable for a long while. Yet nothing is ever truly destroyed; it merely changes form. $E = mc^2$ and all that. The

question is, when is the change in form sufficient for us to refer to it as destruction?

**[1]** To begin with, the damage needn't be total or irreversible. Most things that are destroyed can be made whole by the application of sufficient effort and resources. For example, a crashed car can often be restored to "like new" condition. Nevertheless, we think of a car as "totaled" when the cost of repair exceeds its pre-accident market value. Even if the owner decides to rebuild anyway—perhaps as a hobby or for sentimental reasons—we'd still consider the car to have been destroyed.

**[2]** Destruction also need not eliminate every possible use of the object. *Cf. United States* v. *Causby*, 328 U.S. 256, 258-59, 262 (1946) (government's destruction of ability to use land to raise chickens held to be a taking, even though "enjoyment and use of the land [was] not completely destroyed"). A bricked cell phone might make a nifty paperweight, but it's useless to call your sweetheart. This is particularly true of land, which will generally support many potential uses. For example, land rendered unfit for human habitation by toxic waste may serve as a swell ordnance target range; nevertheless, we reckon the land's been destroyed.

**[3]** While the line between damage and destruction is not a precise one, we consider something to have been destroyed if it is rendered incapable of being used for one or more of its principal purposes, and can't be restored swiftly and relatively cheaply. In the case of land, we consider it destroyed if its aesthetic, environmental, recreational, economic or cultural uses have been eliminated for a significant period of time, generally meaning more than a year. *Cf. Sierra Club* v. *Morton*, 405 U.S. 727, 734 (1972) ("Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society . . . ."); *Friends of the Earth, Inc.* v. *Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 184 (2000) (harm to "recreational, aesthetic, and eco-

nomic interests" is a cognizable injury for purposes of standing); 16 U.S.C. § 470cc(c) (recognizing that archeological sites may have religious or cultural importance to Indian tribes).

**[4]** Finally, when we talk about the destruction of land, we don't just mean the earth's crust. We also refer to the vegetative growth, bodies of water, rock formations and fossils that are found on the earth. *See State* v. *Coffee*, 556 P.2d 1185, 1193 (Idaho 1976) ("Normally, 'land' means a property right and includes all things physical upon the earth, such as soil, trees, and grass."). Burning a forest destroys the land, not just the trees. Vegetation can grow back quickly after a fire, or it may take years or decades. *Cf. Amoco Prod. Co.* v. *Village of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."). As a general matter, if land covered in vegetation is likely to return to its prior condition without human intervention within a year, we would not consider the land to have been destroyed. But if it will likely take substantially more than a year for the vegetation to recover, or require significant human intervention, then the land is deemed to have been destroyed.

**[5] 3.** The district court correctly interpreted section 2K1.4(a)(1) to require that the land here suffer more than short-term damage, but less than complete obliteration: "[This is] not the situation where there's a wildfire and then the next year everything is back just the way it was. It sometimes takes decades for the land to restore itself and sometimes it never happens because of cheatgrass infestation which usually follows right on the heels of a wildfire." If this is true, then the land would clearly have been destroyed under the principles outlined above. But the learned district judge didn't state the basis for his finding, and we see no evidence in the record to support it. The court went on to say: "I deal with these kinds of cases involving impact on the environment all the time.

There's a macrobiotic crust that is devastated by the wildfire. There's just—there's a lot implicate [sic]—that you can't see. The grass may be growing but it's not the same." Yet nowhere in the record was there any evidence that the fires caused any damage to the macrobiotic crust or any cheatgrass infestation. The government did introduce some potentially relevant evidence, including a statement of loss of wildlife habitat and shooting areas and restitution figures for the BLM land. The district court didn't mention this evidence when it applied the higher base offense level, and we don't see an obvious connection between the evidence and the district court's decision.

On appeal, the government argues in support of the district court's theory that the fires destroyed the macrobiotic crust, but that can't make up for its earlier failure to present evidence to that effect. This isn't the sort of common knowledge district judges may rely on in sending someone to prison. Rather, the extent of damage to BLM land is a factual determination as to which there needs to be evidence, quite possibly from experts. The government presented no evidence to support the district court's findings, and Holmes was not given the opportunity to present evidence on how his fires affected the BLM land.

For similar reasons, we can't conclude that Holmes only "endangered" the land, which would result in a lower base offense level than if he destroyed it. *See* U.S.S.G. § 2K1.4(a)(2). Endangering means putting the property at risk but resulting in no actual damage, or damage that is less than destruction. *Cf. Price* v. *U.S. Navy*, 39 F.3d 1011, 1019 (9th Cir. 1994). If the district court on remand finds that the damage to the land doesn't amount to destruction, then it will probably determine that Holmes endangered the land.

\* \* \*

**[6]** We vacate Holmes's sentence and remand so that the district court can impose a sentence that isn't infected by pro-

cedural error. *See United States* v. *Carty*, 520 F.3d 984, 993 (9th Cir. 2008) (en banc).

**REVERSED and REMANDED.**

---

KLEINFELD, Circuit Judge, concurring:

I concur in the result. Although I agree that the sentence should be vacated and the case remanded for resentencing, my reasoning, and the consequence on remand, differ from the majority's.

Holmes set seven different fires over a period of around six weeks. All were on unoccupied land, and fortunately all were put out without injury to anyone. The restitution figure is $155,881.36, most of that for the $132,881.36 the BLM spent on firefighting, the rest for $10,325 for what the volunteer fire department spent and $12,675 for what the rod and gun club had to spend to reseed its acreage. One of the fires burned private land, for which the owner did not ask for any restitution.

Several factors added to Holmes's blameworthiness. He was a volunteer firefighter, and although no special expertise contributed to or was needed to set the fires, people expect firefighters to fight fires, not start them. And he lied when he was caught, sending the authorities down several paths that might have led to charges against innocent people. He gave truck descriptions, license plate numbers, and other identifiers that could have landed someone innocent in federal prison instead of himself. Fortunately, he literally left tracks, tire tracks, pointing to him, reported the fires anonymously from locations establishing that he was probably the person who called 911, his truck was seen by a BLM officer leaving the area where the fires had been reported only thirty seconds before a new fire was discovered, and he set the fires in locations of the fires all within a six mile circle and at times sug-

gesting that he set them all in the afternoon after he got off work and before he got home for dinner.

The only issue before us is whether the district court erred by applying the more aggravated public arson guideline range. Holmes's crimes were all for setting public land on fire, under 18 U.S.C. § 1855. That statute provides for imprisonment for "not more than five years" for willfully setting on fire timber, underbrush or other inflammable material on public lands.[1] Since he set the six fires on six different dates, Holmes committed six separate crimes, so "grouping" was applied, leading to his six-year prison sentence.

The applicable sentencing guideline is a broad one, for "Arson; Property Damage by Use of Explosives," embracing numerous statutes.[2] Timothy McVeigh blowing up the Okla-

---

[1]The statute provides, in full:

Whoever, willfully and without authority, sets on fire any timber, underbrush, or grass or other inflammable material upon the public domain or upon any lands owned or leased by or under the partial, concurrent, or exclusive jurisdiction of the United States, or under contract for purchase or for the acquisition of which condemnation proceedings have been instituted, or upon any Indian reservation or lands belonging to or occupied by any tribe or group of Indians under authority of the United States, or upon any Indian allotment while the title to the same shall be held in trust by the Government, or while the same shall remain inalienable by the allottee without the consent of the United States, shall be fined under this title or imprisoned not more than five years, or both.

This section shall not apply in the case of a fire set by an allottee in the reasonable exercise of his proprietary rights in the allotment.

18 U.S.C. § 1855.

[2]At the time, it embraced the following: 18 U.S.C. §§ 32(a), (b), 33, 37, 81, 112(a), 844(f), (h) (only in the case of an offense committed prior to November 18, 1988), (i), 970(a), 1153, 1362, 1363, 1364, 1855, 1992(a)(1), (a)(2), (a)(4), 2275, 2280, 2281, 2282A, 2282B, 2291, 2332a, 2332f; 49 U.S.C. § 60123(b).

homa City Federal Building, Ramzi Yousef blowing up the World Trade Center in 1993, Ahmed Ressam attempting to blow up Los Angeles International Airport, and Clyde Holmes Jr. burning brush on government land all fall within the same guideline, though if people die, additional guidelines apply. The guideline has four sections with varying base offender levels; (1) 24, for the worst sort of bombing or arson, that knowingly creates substantial risk to persons or destroys such public facilities as airports, planes and ships; (2) 20, for arson creating a substantial risk to persons (but not knowingly) or blowing up or burning down a less important government building or place of public use; (3) 16, for destroying a lighthouse or other aid to maritime navigation; and (4), 2 plus the offense level for theft, property destruction and fraud. Holmes was assigned a 24, and argues that he should not have been. Since he argues for no less than 20, we need not decide whether any more lenient offense level might have been appropriate. All that is before us is whether he was properly assigned a base offense level of 24, the highest.

In my view, that assignment was error. As bad as his crime was, it was not in the same class as blowing up the terminal at LAX,[3] or blowing up a truck in the basement of the World Trade Center in hopes of accomplishing what Al Qaeda subsequently succeeded at in 2001, or blowing up the Federal Building in Oklahoma City. That is the class designated by the guideline for the 24 level.

The 24 level is reserved for arson and bombing that knowingly created a substantial risk of death or serious bodily injury to persons, or involved destruction or attempted destruction of "a dwelling, an airport, an aircraft, a mass transportation facility, a mass transportation vehicle, a maritime facility, a vessel, or a vessel's cargo, a public transportation system, a state or government facility, an infrastructure

---

[3]*Cf. United States v. Ressam*, 629 F.3d 793, 805 (9th Cir. 2010).

facility, or a place of public use."[4] The 20 level, still quite high as sentencing guidelines go, is for arson and bombing that created a substantial risk of death or serious bodily injury to persons but without the element that "the risk was created knowingly," or the destruction was for a structure other than the ones listed in the level 24 guideline, or endangered one of those facilities without destroying or attempting to destroy it. Of course, the level is increased greatly if anyone is injured or killed.[5]

---

[4]U.S.S.G. § 2K1.4(a)(1) (2007).

[5]The relevant sentencing guideline provides, in full:

**§ 2K1.4**. *Arson; Property Damage by Use of Explosives*

(a) Base Offense Level (Apply the Greatest):

(1) 24, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly; or (B) involved the destruction or attempted destruction of a dwelling, an airport, an aircraft, a mass transportation facility, a mass transportation vehicle, a maritime facility, a vessel, or a vessel's cargo, a public transportation system, a state or government facility, an infrastructure facility, or a place of public use;

(2) 20, if the offense (A) created a substantial risk of death or serious bodily injury to any person other than a participant in the offense; (B) involved the destruction or attempted destruction of a structure other than (i) a dwelling, or (ii) an airport, an aircraft, a mass transportation facility, a mass transportation vehicle, a maritime facility, a vessel, or a vessel's cargo, a public transportation system, a state or government facility, an infrastructure facility, or a place of public use; or (C) endangered (i) a dwelling, (ii) a structure other than a dwelling, or (iii) an airport, an aircraft, a mass transportation facility, a mass transportation vehicle, a maritime facility, a vessel, or a vessel's cargo, a public transportation system, a state or government facility, an infrastructure facility, or a place of public use;

(3) 16, if the offense involved the destruction of or tampering with aids to maritime navigation; or

Our task is to construe "place of public use" in the highest level guideline subsection. The majority opinion errs because of a mistaken choice of methodology, looking only at the isolated phrase, without considering its context. Statutory construction,[6] like most interpretation of language, has to take account of context. The traditional legal terms for taking account of context are *ejusdem generis* and *noscitur a sociis*. "Though lawyers do not learn as much Latin as they used to, there is nothing esoteric about listing a series of examples and considering whether something else is like things in the list."[7] *Ejusdem generis*, literally "things of the same kind," means merely that we determine the meaning of a general term by reference to the others in the list. *Noscitur a sociis,* literally, "it is known from its associates," means merely that we deter-

---

    (4) 2 plus the offense level from § 2B1.1 (Theft, Property Destruction, and Fraud).

  (b) Specific Offense Characteristics

    (1) If the offense was committed to conceal another offense, increase by 2 levels.

    (2) If the base offense level is not determined under (a)(4), and the offense occurred on a national cemetery, increase by 2 levels.

  (c) Cross Reference

    (1) If death resulted, or the offense was intended to cause death or serious bodily injury, apply the most analogous guideline from Chapter Two, Part A (Offenses Against the Person) if the resulting offense level is greater than that determined above.

U.S.S.G. § 2K1.4 (2007).

[6]The guidelines are construed similarly to statutes. *See United States v. Treadwell*, 593 F.3d 990, 1006 (9th Cir. 2010) ("We use traditional rules of statutory construction when interpreting the text of the Guidelines. This includes traditional canons of statutory construction." (citations omitted)).

[7]*Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co.*, 153 F.3d 938, 945 (9th Cir. 1998).

mine the meaning of a general term by reference to those with which it is associated.

People use the principles of *ejusdem generis* and *noscitur a sociis* all the time, to understand ordinary speech, without realizing that they are doing so, just as they do not realize that they are speaking prose. When the waiter says "would you like a cocktail? wine? anything else?," we know he is asking for a drink order, not a dessert order, and not whether you would like a new car, even though a new car would fall within the "anything else" category were the phrase considered according to dictionary meaning without regard to context. And when the grade school boy tells his mother "we have to bring a ruler, a pencil, paper, and other stuff to school tomorrow," we know he is talking about school supplies, not his pet puppy. Watching an old movie recently, I saw the words "roll film" on the screen, and quickly realized they meant "start the movie," not "120 film for cameras." The only way to tell that "roll" was a verb, not an adjective, was context.

Context requires that we consider "place of public use" in the context of "a dwelling, an airport, an aircraft, a mass transportation facility, a mass transportation vehicle, a maritime facility, a vessel, or a vessel's cargo, a public transportation system, a state or government facility, [and] an infrastructure facility," just as we consider the waiter's "anything else" in the context of drink orders. The general catchall phrase means something of the same sort as the specific phrases. And that is so even though "place of public use" means, construed in isolation, anyplace at all where the public is not excluded, just as "anything else" means anything at all.

So let us look at the context, filling in concrete examples for generalities. Burning down someone's house necessarily deprives the victim of a place to live and property much of which, such as family photographs, cannot be replaced, and creates a very high risk of death. Burning down an airport is likely to kill people, and certain to create great disruption for

travel and commerce; people will miss weddings and funerals as well as job interviews and sales opportunities, businesses will fail, and many lives will be disrupted. Blowing up an airplane or bus, as terrorists do in Israel, is a pretty far cry from burning brush on empty public land. All these specific categories appear to be some sort of structure, where the structure itself is exceedingly important to people, and destruction is exceedingly dangerous. Burning brush on bare land just does not fit. It can indeed be very dangerous, especially to firefighters, but it is not as likely to kill people as, say, blowing up a government building or a train.

The guideline for level 20 applies to "a structure other than" that list. The phrase "or a place of public use" is in both the 24 and the 20 guideline. The language of the 20 guideline has three strong implications for the case before us. First, by referring to "structure other than," the language for level 20 assumes that all concrete examples in the higher guideline are "structure[s]." A "place of public use" for level 24 is probably, therefore, used by the Sentencing Commissioners, to mean a structure. Second, the language implies that burning down or blowing up public facilities other than airports, airplanes, buses, trains, and so forth, should be punished a little less severely than burning down or blowing up structures in that specially designated class. Third, use of the identical catch-all phrase "place of public use" in both guidelines suggests that the commissioners intended it as a catch-all for things like the preceding concrete terms, not something that trumps even the Pentagon and the White House in how protected it is.

The guideline under which Holmes was sentenced does not address environmental crimes, so it does not much matter for the public arson guideline whether the brush will grow back in a year, or whether the whistle pigs will return promptly, or whether the ground covering after the fire will differ in some respect. No doubt things will be different, just as one can never set foot in the same river twice, and land constantly

changes from natural occurrences including lightening-caused fires. There are numerous guidelines for crimes against the environment, with offense levels ranging from 6 for putting hazardous devices on federal lands,[8] or 8 for mishandling hazardous substances,[9] or 10 for tampering with the transportation of hazardous substances,[10] to 24, for knowing endangerment resulting from mishandling of hazardous substances.[11] Though the majority opinion and the district court have discussed this case as though it were charged and sentenced as an environmental crime, it was not, and none of the environmental crime statutes or guidelines were used. As for the risk that a firefighter might be injured or killed fighting Holmes's fires, the lower level 20 arson and bombing guideline applies where the fire "created a substantial risk of death or bodily injury."

Blowing up a government building, an airport, or a bus or train would be a 24. Under the majority's interpretation, so would setting off a cherry bomb in a BLM trailhead suggestion box. That is not a sensible reading of the statute.[12]

---

[8] 18 U.S.C. § 1864; *see* U.S.S.G. § 2Q1.6(a)(4) (2007).

[9] 42 U.S.C. § 6928(d); *see* U.S.S.G. § 2Q1.2(a).

[10] 49 U.S.C. § 5124; see U.S.S.G. § 2Q1.2(b)(7).

[11] 42 U.S.C. § 6928(e); *see* U.S.S.G. § 2Q1.1(a).

[12] *See United States v. 1996 Freightliner Fld.*, 634 F.3d 1113, 1117 & n.10 (9th Cir. 2011) (citing 2 Henry M. Hart Jr. & Albert M. Sacks, The Legal Process 1414-15 (tent. ed. 1958) ("In determining the more immediate purpose which ought to be attributed to a statute, and to any subordinate provision of it which may be involved, a court should try to put itself in imagination in the position of the legislature which enacted the measure . . . . It should assume, unless the contrary unmistakably appears, that the legislature was made up of reasonable persons pursuing reasonable purposes reasonably . . . . The court should then proceed to [ask] . . . Why would reasonable men, confronted with the law as it was, have enacted this new law to replace it? . . . The most reliable guides to an answer will be found in the instances of unquestioned application of the statute. Even in the case of a new statute there almost invariably are such instances, in which, because of the perfect fit of words and context, the meaning seems unmistakable . . . . What is crucial here is the realization that law is being made, and that law is not supposed to be irrational.")).